**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| STEVEN SHOSHANY, D.C., individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>MULTIPLAN, INC., MULTIPLAN CORP., VIANT, INC., VIANT PAYMENT SYSTEMS, INC., NATIONAL CARE NETWORK, LP, NATIONAL CARE NETWORK, LLC, AETNA, INC., CENTENE CORP., CIGNA GROUP, ELEVANCE HEALTH, INC., HEALTH CARE SERVICE CORPORATION, HUMANA INC., KAISER PERMANENTE LLC, and UNITEDHEALTH GROUP, INC.,<br><br>    Defendants. | Case No.<br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Steven Shoshany, D.C. ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, brings this action against Multiplan, Inc., MultiPlan Corp., Viant, Inc., Viant Payment Systems, Inc., National Care Network, LP, National Care Network, LLC, UnitedHealth Group, Inc., Aetna, Inc., Elevance Health, Inc., Centene Corp., The Cigna Group, Health Care Service Corp., Humana Inc., and Kaiser Permanente LLC (collectively, "Defendants") for violations of the Sherman Antitrust Act and seeks treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demands a trial by jury on all matters so triable.

1

## I.    NATURE OF THE ACTION

1.      MultiPlan, Inc. (with its affiliates, described herein as "MultiPlan") its itself a health insurer and  works as a contractor to health insurers to serve as an intermediary between the insurers and health care providers to determine and negotiate reimbursement rates for procedures performed by the providers. In practice, Multiplan's function is to help insurers to systematically underpay care providers by suppressing reimbursement rates. In addition to harming providers, who are reimbursed at lower rates, MultiPlan's practices also harm patients, who generally have to pay a larger share of the cost of care.

2.      In the past health insurers (and other categories of payors) have reimbursed healthcare providers for out-of-network ("OON") services at "usual and customary" rates. These rates were determined by relying on independent benchmarking databases that aggregated historical information to provide fair and consistent reimbursement rates. Payors competed with each other to pay competitive reimbursement rates so healthcare providers would continue to provide OON services to their insurance customers in non-emergency scenarios in which providers could decline to provide such care.

3.      Payors disliked this competitive system, however, calling it a "pain point" and a "major area of concern." In their view, the use of usual and customary rates created "uncontrolled" costs that ate into their profits. MultiPlan, as a healthcare payor and insurer itself, negotiates the reimbursement rates for providers in its expansive network of Preferred Provider Organizations ("PPOs"). Thus, MultiPlan's profits were also constrained by competitive reimbursements to OON healthcare providers.

4.      In response to these restrictions on profits, MultiPlan created the scheme upon which this Complaint is based. The scheme begins with other payors, including Insurer Defendants, and MultiPlan agreeing to share their confidential claims data in real time, so that

when a payor receives a claim from a healthcare provider for OON services, the claim is sent immediately to MultiPlan. MultiPlan then uses its repricing algorithm to generate a reimbursement amount that is far lower than the payor would otherwise pay on the claim. The new price is then imposed on the healthcare provider, giving the provider only days, or in some cases mere hours, to respond to the "repriced" claim. As a condition of accepting the repriced claim, MultiPlan forces the healthcare provider to forego seeking reimbursement from any other source—effectively locking in the harm caused by the collusive underpayment. MultiPlan then takes a cut of the money that the payor withholds from the healthcare provider. Nearly all major insurance companies have implemented "shared savings" strategies, and nearly all major insurance companies use MultiPlan's tools to implement those services, thus ensuring the success of MultiPlan's scheme.

5.      As set forth below, Defendants' scheme violates federal antitrust law in several ways. First, MultiPlan and the Insurer Defendants compete horizontally as healthcare payors, yet they agreed with one another to artificially suppress reimbursement rates paid to healthcare providers for OON services. It is per se illegal for actual or potential competitors to fix the prices that they will pay for services by agreeing on the method for calculating the offered repayment. Defendants' facially anticompetitive horizontal agreement restrains trade and is a per se violation of Section 1 of the Sherman Antitrust Act.

6.      Even if MultiPlan and the Insurer Defendants did not or could not potentially compete as healthcare payors, they have nonetheless engaged in an illegal hub-and-spoke conspiracy to fix the price of OON reimbursement claims. Under this scenario, MultiPlan (the hub) entered into agreements with the Insurer Defendants and other co-conspirators (the spokes), which had the intent and effect of outsourcing decisions on pricing OON reimbursement claims to a single common entity, MultiPlan (the hub). Moreover, the Insurer Defendants and other co-conspirators

3

did so while knowing that one another were doing the same thing and for the same purpose (the rim). This facially anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Antitrust Act. Even if Defendants' conduct somehow benefitted competition and furthered consumer welfare in some minimal way (it does not), the conspiracy's anticompetitive effects would vastly outweigh any benefits to Plaintiffs and should thus also be swiftly condemned under the Rule of Reason.

7.      Finally, the Defendants' agreements to use MultiPlan's repricing tools to set reimbursement rates on OON claims violates Section 1 of the Sherman Antitrust Act because those agreements unreasonably restrain trade and have anticompetitive effects throughout the market for reimbursements for OON healthcare services while providing no countervailing procompetitive benefits.

8.      These violations of the antitrust laws have caused Plaintiff to suffer massive economic losses as they have received and continue to receive artificially suppressed reimbursement rates on OON reimbursement claims. As MultiPlan brags, Plaintiff receives these artificially suppressed reimbursement rates on 98-99% of OON reimbursement claims, underscoring the vast scope of Plaintiff's injuries and the conspiracy's impact.

9.      Plaintiff would have received fair and competitive reimbursements for their OON healthcare services in the absence of Defendants' conspiracy.

10.     As a result of Defendants' unlawful agreement, health care providers, including Plaintiff and the Class members, throughout the United States have received artificially repressed reimbursements for OON healthcare services they have provided beginning no later than July 1, 2017, and running through the present (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

## II.    JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction over the of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

12.    Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because one or more Defendants transacts business, has agents, maintains business facilities,  and/or is licensed to do business in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

13.    The Court has personal jurisdiction over Defendants because, among other things, Defendants either (1) transact business throughout the United States, including this District; (2) have substantial contacts within the United States, including in this District, and/or (3) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and doing business in the United States, including in this District.

14.    During the Class Period, Defendants and their co-conspirators conducted activities as set forth in this Complaint that have substantially affected and are within the flow of interstate commerce. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including this District.

## III.    PARTIES

### A.    Plaintiff

15.    Plaintiff Steven Shoshany, D.C. is a resident of New York, New York. Plaintiff provides chiropractic services. Plaintiff provides OON services and has had OON claims repriced by one or more Defendants during the Class Period, including within four years preceding the filing of this Complaint.

**B.** **Defendants**

**1.** **MultiPlan and Affiliates**

16.     Defendant MultiPlan, Inc. is a New York corporation with its principal place of business in New York.

17.     Defendant MultiPlan Corporation, a publicly traded company, is the parent company of MultiPlan, Inc., and the various entities that carry out MultiPlan's operations.

18.     Defendant MultiPlan Corporation used to be known as Churchill Capital Corporation III, which was a special-purpose acquisition company incorporated in Delaware and formed to take MultiPlan, Inc., public. Churchill Capital Corporation III changed its name to MultiPlan Corporation after it and its related entities acquired Defendant MultiPlan, Inc., and its related entities in October 2020.

19.     Defendant Viant, Inc. ("Viant") is a Delaware corporation with its principal place of business in Illinois. Viant is a healthcare payment solutions company. Viant offers to commercial and public health insurance customers in the United States auditing and reimbursement for medical claims and costs, as well as pre-payment services such as facility bill review and professional negotiation.

20.     Defendant Viant Payment Systems, Inc ("VPS"), is a Delaware corporation with its principal place of business in Illinois. In 2010, MultiPlan acquired Viant and VPS.

21.     Defendant National Care Network, LP, a Delaware limited partnership, and Defendant National Care Network, LLC, a Delaware limited liability company (collectively, "NCN"), have their principal places of business in Texas, and were acquired by MultiPlan in 2011.

22.     Unless otherwise specified, this Complaint refers to Defendant MultiPlan, Inc., MultiPlan Corporation, Churchill Capital Corporation III, Defendant Viant, Defendant VPS, Defendant NCN, collectively as "MultiPlan."

### 2.    Insurer Defendants

23.    Defendant Aetna, Inc., a subsidiary of CVS Health Corporation, is a Delaware corporation with its principal place of business in Connecticut. Aetna has a commercial insurance network that pays in- and OON healthcare claims from healthcare providers in all 50 states and Washington, D.C. Aetna is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

24.    Defendant Centene Corporation, a Delaware corporation with its principal place of business in Missouri, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) Medicare Advantage plans, and (4) Medicaid plans.

25.    Defendant The Cigna Group, a Delaware corporation with its principal place of business in Connecticut, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

26.    Defendant Elevance Health, Inc., formerly known as Anthem, Inc., an Indiana

corporation with its principal place of business in Indiana, includes many Blue Cross Blue Shield plans. Elevance offers health insurance plans in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. Elevance is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

27.     Defendant Health Care Service Corporation ("HCSC"), a Mutual Legal Reserve Company with its principal place of business in Illinois, is the parent company, or otherwise affiliated or related company, many commercial health insurance and prescription drug plans that operate in the United States. HCSC is an independent licensee of the Blue Cross and Blue Shield Association (BCBSA) separately with its principal place of business in Chicago, Illinois. HCSC does business in the State of Illinois as Blue Cross and Blue Shield of Illinois (BCBSIL). The various HCSC and BCBSA plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

28.     Defendant Humana, Inc., a Delaware corporation with its principal place of business in Kentucky, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form

of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

29.     Defendant Kaiser Permanente LLC, a California corporation with its principal place of business in California, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) Medicare Advantage plans, and (4) Medicaid plans.

30.     Defendant UnitedHealth Group, Inc. ("UnitedHealth"), a vertically integrated Delaware corporation with its principal place of business in Minnesota, consists of two divisions, UnitedHealthcare and Optum. UnitedHealthcare, the largest commercial health insurance company in the United States, provides health benefit plans. Optum provides other health services. UnitedHealth has various wholly owned subsidiaries, including UnitedHealthcare, which pays in- and OON claims from healthcare providers in every state and the District of Columbia. UnitedHealth's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

31.     Defendants Aetna, Elevance, Centene, Cigna, Health Care Services Corp. Humana, Kaiser Permanente and UnitedHealth (hereinafter referred to as the "Insurer Defendants" have all entered into an OON repricing agreement with MultiPlan, participated in the conspiracy, and performed acts and made statements in furtherance of the conspiracy.

9

32.     To be clear, MultiPlan is also an insurer. The reference to the Defendants who are not corporate affiliates of MultiPlan as the "Insurer Defendants" should not be construed as suggesting that MultiPlan is not an insurer. It is strictly for ease of reference based on common usage, as the entities referred to herein as "Insurer Defendants" are conventionally referred to as insurers, whereas MultiPlan also performs functions not conventionally referred to as insurance.

33.     MultiPlan and the Insurer Defendants are collectively referred to as "Defendants." Defendants and other participants in the conspiracy described herein are referred to as the "MultiPlan Cartel" in this Complaint.

## IV.     FACTUAL BACKGROUND

### A.  The Role of PPO Networks in the U.S. Health Insurance Marketplace

34.     Commercial health insurance is commonly sold in one of two familiar structures: Health Management Organizations (" HMOs"), and PPOs.

35.     HMOs are  known for having relatively rigid provider networks and lower costs. HMO plans will not cover medical care rendered by a provider outside of their network except in emergencies; and they often require health plan members (*i.e.,* patients) to obtain referrals from their primary care doctor before seeing a specialist. Because an HMO plan offers greater predictability for insurers and less choice for consumers, it is typically available to patients at a lower premium compared to other types of plans.

36.     A PPO, on the other hand, provides members with flexibility and freedom in their medical care. PPOs cultivate large networks of physicians: these "in-network" physicians have contracted with the insurer offering the PPO plan and agreed to accept reduced reimbursement for their services in exchange for being marketed to the plan's members as an "in-network." To entice plan members to see in-network healthcare providers, insurers offer members lower co-pay or co-insurance obligations. Therefore, that in-network healthcare provider is more likely to gain more

business from being in-network. In effect, in-network providers offer insurers a volume discount.

37.     PPO plan members need not confine their medical care to only in-network healthcare providers: they are free to see any provider they choose. When a PPO plan member sees a doctor who has not contracted with their insurer, or who has contracted with their insurer for some medical procedures but not others, that care is considered OON care. This means that care is not governed by any contractual agreement between the provider and the insurer. Because there is no contract governing the provision of the care provided or the reimbursement for that care, the provider and the insurer must negotiate after the services are rendered to agree upon a fair price for the providers' services. This freedom of choice in medical care is valuable to patients. For example, a patient might need to seek care while traveling in a location that does not have any in-network providers; necessary substance abuse or mental health treatment may not be available from an in- network provider; an OON provider may have earlier available appointments to meet an urgent need; or a patient's primary care physician might determine that an OON provider will provide the patient with the best care. As a result, PPO plans are more popular than HMOs. According to one study, PPOs are the most common type of employer-provided healthcare plan, covering 47% of all covered employees.

38.     And because patients value the freedom afforded by a PPO, insurers are able to charge members higher premiums for a PPO plan than they can for an HMO. The average PPO plan established under the Affordable Care Act costs about $800 per year more than the average HMO plan for a 30-year-old subscriber. At the same time, insurers offering PPO plans encourage their subscribers to seek care from in-network providers, because in-network providers agree in advance to accept lower rates for their services.

### B.     The Origins of MultiPlan

39.     MultiPlan, founded in 1980, has existed for more than 40 years. But its business, and the services it provides, have evolved over time.

40.     MultiPlan began as an organizer of PPOs.  MultiPlan would sell nationwide and regional "wrap networks" (or just "wraps")  to insurance companies, allowing insurers to expand the networks available to members of the insurers' PPO insurance plans. MultiPlan touts itself as "the oldest and largest independent Preferred Provider Organization (PPO) network" in the United States. Even as MultiPlan expanded its business from PPO networks into analytic "repricing" tools, as described below, it continued to operate its PPO networks.

41.     MultiPlan profits by selling access to its multitudinous PPO networks to competing insurance companies and other healthcare payors, including the Insurer Defendants.

**C.     Traditional Methods of Calculating Rates of Reimbursement of Providers Affiliated With PPOs**

42.     In exchange for the higher premium paid by the subscriber, an insurer offering a PPO plan agrees to reimburse a substantial portion of the cost of OON care.

43.     For decades, OON reimbursement rates were determined by reference to a benchmark referred to as the "Usual, Customary, and Reasonable," or "UCR," rate. A charge is considered "usual" if it represents a healthcare provider's usual charge for a specific medical procedure. It is "customary" if it falls within a range of fees that most healthcare providers in the relevant geographic area charge for that procedure. And it is "reasonable" if it is both usual and customary, or if it is otherwise justified because of special circumstances. Out-of-network reimbursements were commonly expressed as a percentage of the UCR rate: a common reimbursement amount was 80% of UCR.

44.     Historically, databases of UCR rates were available from two companies. First, there was the Prevailing Healthcare Charge System ("PHCS"), a database first developed by the

Health Insurance Association of America in 1974. Second, there was a company called Medicode, which maintained the Medical Data Research ("MDR") database. Healthcare providers and insurers could consult either of these databases, or both, when determining a fair reimbursement for out- of-network reimbursement amount for services rendered.

### D.     Defendants are Competitors

45.     MultiPlan's PPO networks compete with other commercial health insurance payors, including the Insurer Defendants, to contract with healthcare providers and expand the size of their respective networks. In fact, MultiPlan admits that it competes directly with the PPO networks offered by the Insurer Defendants to entice healthcare providers to join their respective networks. In its Annual Report for the year ending December 31, 2023, filed with the SEC on or about February 29, 2024, MultiPlan stated that, when providing its "network-based services" it competes "directly with other independent PPO networks," including "with PPO networks owned by our large Payor customers." It made similar statements in its Annual Reports for years 2021 through 2023.

46.     Insurer Defendants also operate nationwide PPO networks. Defendants create these PPOs by recruiting healthcare providers, negotiating reimbursement rates with them, and setting quality and credentialing expectations for those providers. Then, Defendants sell access to their PPO networks as part of a health insurance plans. Subscribers to insurance plans with PPOs can access any healthcare provider in the PPO's network ("in-network providers") at a reduced rate, but typically pay a greater portion of a healthcare provider's fee if they choose a provider who does not belong to their insurer's PPO network, who would be an OON provider,

47.     Defendants operate multiple nationwide PPO networks. To create these PPOs, Defendants recruit healthcare providers, negotiate reimbursement rates with them, and set quality

and credentialing expectations for them. Then, Defendants sell access to their PPO networks as part of a health insurance plan. Subscribers to insurance plans with PPOs can access any healthcare provider in the PPO's network ("in-network providers") at a reduced rate, but typically pay a greater portion of a healthcare provider's fee if they choose a provider, an OON provider, who does not belong to their insurer's PPO network.

48.     For example, Defendant Aetna offers the Aetna Open Choice PPO plans. Defendant Elevance, Defendant HCSC, and other Blue Cross Blue Shield entities offer Blue Choice PPO plans. Defendant UnitedHealth offers UnitedHealthcare Options PPO Plans. Defendant Centene offers its PPO plans through its Ambetter Health product. Defendant Cigna offers the Cigna PPO Network. Finally, Defendant Humana offers Medicare Advantage PPO Plans.

49.     MultiPlan describes itself "as a leading independent national" PPO. Indeed, in 2023, MultiPlan advertised that it owns and operates "the largest independent, nationwide primary" PPO in the United States, called the PHCS Network, which includes "more than one million health care providers nationwide: 920,000 practitioners, 4,800 acute care hospitals and 87,000 ancillary facilities." A primary PPO network like PHCS serves as the network of healthcare providers for health insurance companies and other payors of commercial health insurance claims that lack "their own direct contractual discount arrangements with providers."

50.     In addition to its nationwide primary PPO network, PHCS Network, MultiPlan offers regional PPO networks. For example, its HealthEOS and HealthEOS Plus Networks serve Wisconsin, Michigan, Minnesota, and Illinois. Beech Street Network is MultiPlan's regional PPO network that serves Alaska, Nevada, and Utah. And MultiPlan's AMN/HMN/RAN Network serves Arizona and Hawaii. MultiPlan also markets three complementary PPO networks—MultiPlan Network, Beech Street Network, and IHP Network—through which competing healthcare payors,

after purchasing access, may expand their rosters of in-network providers.

51.     Various entities subscribe to MultiPlan's primary PPO Network, including provider- sponsored and independent health plans, union health plans, and TPAs. And many other entities subscribe to MultiPlan's complementary PPO networks, including "large commercial insurers, property and casualty carriers via their bill review vendors, Taft-Hartley plans, provider-sponsored and independent health plans, and some TPAs."

52.     MultiPlan profits by selling access to its multitudinous PPO networks to competing insurance companies and other healthcare payors, including the Insurer Defendants.

53.     MultiPlan's PPO networks compete with other commercial health insurance payors, including the Insurer Defendants, to contract with healthcare providers and expand the size of their respective networks. In fact, MultiPlan admits that it competes directly with the PPO networks offered by the Insurer Defendants to entice healthcare providers to join their respective networks. In its Annual Report filed with the SEC on February 29, 2024, MultiPlan stated that, when providing its "network-based services" it competes "directly with other independent PPO networks," including "with PPO networks owned by our large Payor customers." It made similar statements in its Annual Reports for years 2021 through 2023.

**E.      Defendants' Earlier Anticompetitive Scheme**

**1.      The Ingenix Scheme**

54.     In 1996, UnitedHealth formed a wholly owned subsidiary called Ingenix. UnitedHealth then acquired both MDR (in 1997) and PHCS (in 1998) and merged their two UCR databases under Ingenix's auspices. For a decade after Ingenix's founding, the UCR database was controlled by health insurance giant UnitedHealth, a company with a clear incentive to depress reimbursement rates.

55.     Other insurers—which had the same incentive to depress reimbursement rates—quickly signed on to use Ingenix's new database and agreed to contribute to that database by sending their competitively sensitive claims and reimbursement data to their competitor, UnitedHealth's, subsidiary.

56.     This created a closed-loop system for benchmarking reimbursements—and a clear conflict of interest. The data was provided by insurers with an incentive to depress UCR rates, maintained by an insurer with an incentive to depress UCR rates, and accessed by users with an incentive to pay as little as possible for OON medical services. In a marked shift from the pre-Ingenix era, there was no longer any oversight from an entity outside of the insurance industry to ensure the accuracy of the data, and—since UnitedHealth purchased both legacy UCR databases—there was no other place to turn for this critical benchmark. UCR is supposed to fairly reflect the market rate for healthcare services across the country. But, following the rise of Ingenix, what was "usual, customary, and reasonable" was being decided by one company: UnitedHealth.

57.     Ingenix claimed that it imposed rigorous reporting requirements on its competitor insurers, and that it carefully and routinely audited the data, so that the database would accurately reflect UCR rates. It touted the database as transparent and fair. But it quickly became clear that was not true.

**2.      The New York Attorney General Took Action Against the Ingenix Conspiracy**

58.     In 2008, following increasing consumer complaints about large, surprise medical bills, the New York Attorney General ("NYAG") launched an investigation into Ingenix. The investigation was soon followed by a lawsuit filed by the American Medical Association and an investigation by the U.S. Senate's Committee on Commerce, Science and Transportation.

59.     To cover up the market-wide, collusive manipulation of the UCR benchmark,

insurers tried to mislead investigators, healthcare providers, plan sponsors, plan members, and the public. Federal and state investigators decried the "shocking lack of transparency and accuracy" from Ingenix and the insurers. For example, the NYAG reported that "[o]ne national insurer filled an entire page with a list of alternative ways in which it purported to calculate out-of-network rates, in language that can best be described as gobbledygook"—when, it turns out, it could have just admitted that it simply "pa[id] the same rates for in-network and out-of-network care." Others continued to represent to plan sponsors and members that they calculated UCR reimbursement rates by reference to the PHCS database—which they failed to disclose had been purchased and gutted by an insurer—rather than acknowledge they were using a database run by a competitor.

60.    These investigations concluded that "the out-of-network system [was] broken." Although Ingenix and UnitedHealth touted their database as accurate, and insurers told their members they were using a benchmark that was independent and fair, Ingenix was, in fact, none of these things. As one of the lawyers leading the New York investigation later explained to the Senate Committee:

> Reasonable and customary rates are supposed to fairly reflect market rates, but our investigation revealed that Ingenix [was] nothing more than a conduit for rigged information that [was] defrauding consumers of their right to fair reimbursement for their out-of-network healthcare costs.

Although insurers promised plan members in their policy documents to reimburse based on UCR rates, they instead reimbursed "based on schedules compiled by one of their own, the nation's [then] second largest health insurer, which has an interest in depressing reimbursement rates." The Ingenix schedules were "unreliable, inadequate and wrong."

61.    Ingenix claimed to stand behind the integrity of its database. It claimed it ran "a number of analyses to check and make sure" that the data contributed by its competitors was accurate and complete.

62.     The NYAG and Senate investigations found widespread manipulation of the data inputs to the Ingenix database—both by the insurers submitting data, and by Ingenix itself.

63.     Some insurers "scrubbed," or deleted, high value claims before submitting their data to Ingenix. Aetna, for example, eliminated the highest 20% of valid medical charges before sending its data to Ingenix. After Ingenix received that data, it itself scrubbed the data again—as it did with all data received—removing yet more high medical charges from the dataset before inputting it to the database.

64.     Another contributor, who submitted data for more than 5 million claims a month, did not submit true claims data. Instead, it "aggregate[d] the data in the relevant time period by zip code for each procedure code" and then "provide[d] Ingenix the average charge regarding each procedure." So, for a simple example, if the insurer had 5 claims for a procedure, one for $10, one for $20, one for $50, one for $80, and one for $90, the insurer averaged these values, and submitted to Ingenix five claims, each at $50. This sleight of hand dramatically distorted the distribution of charges in the database, as the Senate Office of Oversight explained: "if the insurer submitted an average cost of $75 for two medical procedures, Ingenix would have no way to determine if the charges that averaged to $75 were from an original distribution of $74 and $76 or from a distribution of $50 and $100." This flattening of the spread of charges, which the insurer applied to millions of claims every month, dramatically distorted the charges in the database, and could make a $100 charge seem like much more of an outlier than it actually was.

65.     Other insurers deleted any charges that reflected modifiers that indicated procedures or services with complications which would justify a higher than usual charge, making it appear as if more complicated procedures were less expensive than they actually were. Others failed to collect information that affected the value of the service at all. Some insurers pooled data

that should be kept separate, for example by aggregating the rates charged by nurses, physicians assistants, and physicians. And some salted their data with in-network claims—which were paid at lower-than-market rates agreed to by contract.

66.     Ingenix claimed that any such manipulation was a non-issue because the company "r[a]n a number of analyses to check and make sure" that the data was accurate and complete. But as Ingenix executives were forced to admit (under oath), "Ingenix has *never* tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median, or 80th percentile or actual marketplace . . . rates charged by healthcare providers in any given area."

67.     Ingenix purported to require its insurer contributors to "include all data fields that [the insurer] currently collects that are required in the data contribution format" for *all* claims it received, and prohibited contributors from "manipulat[ing] or present[ing] the data so as to provide only a particular subset of its data." But although it publicly claimed to stand behind the Ingenix data, behind the scenes, Ingenix and the insurers knew it was not accurate. Ingenix even admitted, in its private contracts with insurers, that the UCR data was provided "for informational purposes only," and that "[a]ny reliance upon, interpretation of and/or use of the Data by [an insurer] is solely and exclusively at the discretion of [that insurer]."

68.     And Ingenix itself further manipulated the claims data after it was submitted by other insurers. It deleted the highest claims it received, and—when there was not sufficient data from which to derive a UCR for a given medical procedure in a given geographic location, it would make one up using a faulty methodology and data from dissimilar procedures or locations.

69.     As a result of these database manipulations, the Ingenix database underrepresented the market rate for health care services by up to 28%, translating into hundreds of millions of dollars of underpayment in just New York State alone.

**3.** **Settlement of the NYAG Action and Implementation of the FAIR Health Database**

70. The Ingenix scheme led to civil settlements of class action lability.

71. On January 14, 2009, UnitedHealth settled with the NYAG, agreeing to shut down the Ingenix database and contribute $50 million toward the creation of a new, independent database that would house more aggregated information. This new database became known as FAIR Health.

72. Other commercial health insurers, including Cigna and Aetna, entered similar settlement agreements with the NYAG. On January 15, 2009, Aetna agreed to end its relationship with Ingenix and pay $20 million toward FAIR Health's development. Similarly, on February 18, 2009, WellPoint, Inc. agreed to stop using Ingenix and contribute $10 million toward the creation of FAIR Health.

73. UnitedHealth's Ingenix scheme also led to class action litigation and class-wide settlements.

74. For example, UnitedHealth paid $350 million to settle a class action. As part of the settlement agreement, UnitedHealth agreed to use the FAIR Health database for a five-year period of time. Once that limited period lapsed, however, it joined the other Insurer Defendants in the MultiPlan scheme.

75. For instance, UnitedHealth paid $350 million to settle a class action. As part of the civil settlement, UnitedHealth agreed to use the FAIR Health database for a period of time.

76. FAIR Health was created as part of an effort to provide transparency regarding health insurance to both consumers and practitioners. It collects healthcare claim records from health insurers around the country – more than 2 billion claims in total – that it includes in its database. FAIR Health makes the results of its efforts available to consumers, researchers, businesses, and more.

20

77.     Before MultiPlan and its analytical tools launched, FAIR Health was widely used throughout the commercial health insurance industry for pricing OON reimbursements.

### 4.      The Requirement to Use FAIR Health Expired

78.     Commercial payors – including UnitedHealth, Cigna, and Aetna – were only required to use FAIR Health for five years (until approximately 2014) under their agreements with the NYAG. This fatal loophole[1] in the NYAG settlement would allow Defendants to again collude after this requirement expired.

### V.      DEFENDANTS' ANTICOMPETITIVE CONDUCT: MULTIPLAN 2.0

79.     Over the past 10-15 years, MultiPlan has developed and implemented what it calls "claims repricing" services to address the bills insurers receive when a member receives care from providers who are not in the insurer's preferred network. This "claims repricing" service is designed and functions to suppress and fix prices that insurers pay healthcare providers for OON medical care. The term "repricing," as used hereinafter, should therefore be understood to equate to "price-fixing."

80.     MultiPlan obtained its repricing technologies primarily through acquisitions. In 2009, MultiPlan acquired Viant. In 2011, MultiPlan, through its acquisition of Defendant NCN, acquired its "Data iSight" algorithm. In 2014, MultiPlan acquired Medical Audit & Review Solutions ("MARS"), another repricing technology provider.

### A.  MultiPlan 2.0 Works By Using Real-Time Data Interchange Among Competitors to Fix Prices

81.     MultiPlan uses Data iSight and its other algorithms as "repricing tools" to formulate its reimbursement recommendations. This software purportedly calculates a

---

[1] Chris Hamby, "Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill," *The New York Times*, (Apr. 7 2024, updated Apr. 9, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html

reimbursement recommendation based on historical claims to similar providers for similar services. MultiPlan claims that Data iSight differentiates itself from other like services through its patented repricing methodology and its large, proprietary database of historical claims. In contrast, other claims repricing services base their methodologies on usual and customary rates or Medicare rates. MultiPlan boasts that its software achieves "optimal reimbursement"—*i.e.,* the lower-possible payments to healthcare providers—when "compared to Usual and Customary and Medicare-Based pricing."

82.     MultiPlan represents that Data iSight is proprietary technology that brings "order, efficiency, affordability and fairness" to the healthcare system through cost management solutions that ensure reasonable medical expenses for insurers, while protecting the insurers' members from balance billing. According to MultiPlan, this is accomplished by subjecting healthcare providers' OON bills to a proprietary algorithm that "reprices" the claim to be more in line with typical reimbursements. Both MultiPlan and its co-conspirators tout the company as "an independent third-party vendor" that "applies proprietary logic to arrive at a recommended rate" of reimbursement using "a pricing tool that . . . calculate[s] a 'fair' reimbursement."

83.     MultiPlan represents that, when it receives a claim from an insurer, it processes it through Data iSight's proprietary algorithm, which provides what MultiPlan calls "reference-based pricing." According to MultiPlan, that algorithm accounts for the location, size, and type of the healthcare provider; the severity of the medical condition treated; the resource-intensity of the procedure, and the costs of and reimbursements to healthcare providers providing the same treatment for the same condition. MultiPlan claims its algorithm adjusts its recommended reimbursement according to whether a healthcare provider is from a practice or a hospital; whether it is a small local facility or a large hospital system; whether the provider practices in a rural,

suburban, or urban setting; and whether it is a public hospital, a private hospital, or an academic "teaching" hospital, among other factors. According to MultiPlan, the algorithm adjusts each of these comparator claims to remove the effect of local and regional costs of living, averages these claims together to arrive at a benchmark, and then adjusts that benchmark according to the cost-of-living index for the billing provider's location. According to Multiplan, this process—whether for an inpatient or outpatient services—yields a "recommended payment" that the insurer is free to accept or reject, and MultiPlan then returns that recommendation to the insurer. According to MultiPlan, if the insurer agrees with this "recommended" reimbursement, it then conveys the offer to the provider. MultiPlan publicly claims the recommended reimbursements are accepted by providers in an overwhelming majority of cases— MultiPlan has estimated that providers accept the offer between 93% and 99.4% of the time. But if a provider refuses to accept the offer, MultiPlan claims to negotiate in good faith with the provider on an insurer's behalf.

84. MultiPlan's analytics tools work by virtue of deep technological connections between MultiPlan and its competitors. Pursuant to their agreements with MultiPlan, competing insurance networks send their claims to MultiPlan via an electronic data interchange. These claims come to MultiPlan with detailed information such as the procedure code, dates of service, the billed amount, and an alphanumeric code indicating whether the claim is subject to an insurance network's previously disclosed reasonable and customary OON rates.

85. Those claims are then loaded into MultiPlan's "Claims Savings Engine," known internally as FRED. Pursuant to the contracts between MultiPlan and its competitors, FRED routes the claim to one of several proprietary algorithms owned by MultiPlan, including Data iSight, Viant, Pro Pricer, and MARS. Those algorithms apply the pre-agreed claims suppression methodology to the claim to determine how little MultiPlan can offer a healthcare provider for the

good or service in question and still have that offer accepted.

86.     The nature of how MultiPlan's tools suppress reimbursement payments for out-of-network claims is non-public and proprietary.  MultiPlan creates white papers that describe in detail the relevant pricing processes that those tools use for OON claims.  Some, but not all, of those white papers have been made public in court filings.

87.     White papers describing MultiPlan's Data iSight tool underline the extent to which insurers have agreed to use a common methodology to set prices—including maximum and minimum prices—and snuff out competition among themselves. One MultiPlan white paper, dated June 2019, entitled "Data iSight Product and Methodology Inpatient Module" explains the methodology Data iSight uses to generate prices for in-patient claims.  Data iSight begins by compiling "a national benchmarking group that contains claim and cost data for cases of like severity in hospitals with characteristics that match those of the hospital on the claim being analyzed."  This same benchmarking process is employed by every single payor that uses Data iSight to reprice its claims.  Thus, when CHS generates a claim at any hospital, all payors using Data iSight use the same benchmark group to generate pricing offers for claims from that hospital.

88.     The next step, according to the whitepaper, is to "adjust costs of all comparison cases based on hospital's wage index."  Once again, in this step, all payors using Data iSight are using the same methodology—an adjustment based upon the claim-generating hospital's wage index—to determine their pricing offer.

89.     The third step is to "calculate the median benchmark cost of the service," according to the whitepaper.  MultiPlan pulls the data in this step from the Hospital Provider Cost Report Information System which is maintained by CMS.  Again, this methodology is common to all payors who use Data iSight to reprice claims coming from any given hospital.

90. In the final step, Data iSight applies "standard overrides" which set upper and lower bounds on the prices its system would otherwise generate. These overrides "are always in place" and "establish the upper and lower limits for the Data iSight price" for all payors who use Data iSight to reprice claims.

91. Another MultiPlan whitepaper, entitled "Data iSight Facility Methodology" discusses the Data iSight methodology for out-patient claims. It describes a process similar to the one for in-patient claims, with a common methodology generating prices across Data iSight customers for claims arising from any one provider. It also says that "the typical client-elected override is never to pay more than 400% of Medicare."

**B.    "Overrides" Set Prices at Even Lower Levels Than Would Be Set By Use of Algorithms Alone**

92. Although members of the MultiPlan Cartel refer to their price-setting mechanism as an "algorithm," the reimbursement amounts offered to physicians are not resolved by use of an algorithm.

93. When MultiPlan receives a provider's claim for payment forwarded by an insurer, it does subject the claim (initially) to an algorithm similar to the one described above. But what MultiPlan does *not* disclose—and what members of the Cartel have historically kept well hidden from providers, plan sponsors, patients, and the public—is that *after* running the algorithm, MultiPlan secretly manipulates the algorithm's results on behalf of the insurer by imposing what it calls "overrides."

94. Data iSight applies "standard overrides" which set upper and lower bounds on the prices its system would otherwise generate. These overrides "are always in place "and "establish the upper and lower limits for the Data iSight price" for all payors who use Data iSight to reprice claims.

25

95.     A MultiPlan whitepaper also notes that clients may apply *additional* overrides, including "Don't pay more than x% of the claim's Medicare reimbursement (note: defaults to 250% if client elected)." MultiPlan discloses to its claims repricing clients how their competitors (i.e., other large commercial insurance companies) have calibrated these "elective" overrides. MultiPlan recommends that payors adopt "overrides" which are the same as those implemented by their competitors. Over time, MultiPlan has achieved an industry-wide suppression of OON reimbursement payments by coordinating lower and lower "overrides" (i.e., lower and lower percentages of Medicare rates as the price ceiling) among the members of the MultiPlan Cartel.

96.     When an insurer first joins the MultiPlan Cartel, it signs an agreement with MultiPlan. As part of that agreement, the insurer agrees that it will work with MultiPlan to select a secret price it will pay providers. The agreement contemplates that this secret rate will be determined according to business criteria mutually agreed upon between the insurer and MultiPlan. That secret rate could be either a fixed dollar value or benchmarked to a percentage of the prevailing Medicare reimbursement rates.[2]

97.     As MultiPlan explains in a secret white paper available to members of the Cartel and to potential Cartel members:

> In accordance with preselected parameters set by the client to meet its business needs, the initial target reimbursement amount is calculated by applying the median benchmark costs and applying an additional margin factor. Any applicable override rules . . . are then applied to arrive at the recommended reimbursement amount.

98.     The mutual agreement required by the contract ensures that MultiPlan can exert a measure of control upon each of the insurers that joins the Cartel; keeping them aligned in their payment amounts, and gradually decreasing those amounts over time to further the Cartel's goals.

---

[2] Medicare's reimbursement rates are far lower than standard reimbursements that would be offered by insurers in a competitive market. They are lower even than the manipulated rates insurers paid out when participating in the Ingenix scheme in the early 2000s.

99.     Internal documents and sworn testimony from UnitedHealth and its executives show how the scheme worked in real time, using emergency room charges as an example. When UnitedHealth joined the MultiPlan Cartel, it collaborated with MultiPlan to choose its overrides. It settled on two initial overrides, which it misleadingly referred to as a floor and a ceiling: the "ceiling" was 500% of Medicare reimbursement rates; and the "floor"—or the amount that UnitedHealth claimed was the least it would pay—was 350% of Medicare reimbursement rates.

100.     The MultiPlan Cartel chose to use rates tied to Medicare rates for public relations reasons: it sounded like a large, benevolent number, and 500% of Medicare rates sounded more generous than 80% of UCR. As MultiPlan instructed its co-conspirators, paying even just 120% of the government-set Medicare rates "sounds fair, maybe even generous," but these rates were "inherently misleading" because "the average consumer does not understand just how low Medicare rates are. This allowed them to paint physicians' bills as exorbitant—more than 5 times what the government says their services are worth—to create a narrative that the MultiPlan Cartel's collusive price-fixing was necessary to combat greedy medical professionals. (Consistent with the Cartel's plan to surreptitiously lower reimbursements overtime, UnitedHealth would lower its ceiling from 500% in 2016 to 350% in 2018, and then later to 250%.)

101.     In sworn testimony, UnitedHealth's former Vice President of Out-of-Network Programs, John Haben, described the "waterfall" that OON bills would be subjected to after an insurer selected its secret overrides. When UnitedHealth received a bill for services that were outside of its PPO network, it forwarded that bill to MultiPlan. MultiPlan then checked whether the provider's services fell within the MultiPlan wrap network in which UnitedHealth participated. If so, it would test the billed charges against UnitedHealth's chosen "ceiling" override. If the contracted rate for that bill amounted to less than 500% of Medicare reimbursement rates, MultiPlan

would advise UnitedHealth to pay that contracted rate. But if the contracted rate was higher than that ceiling, MultiPlan would attempt to negotiate with the provider on UnitedHealth's behalf. If negotiations were unsuccessful, MultiPlan would then subject that bill to the Data iSight algorithm.

102.     The algorithm—which used the actual cost of providing the service as a starting point and added a small margin—was doomed to produce a number lower than 350% of Medicare reimbursement rates. As noted above, Medicare reimbursement rates are low: 84 cents on every dollar a healthcare provider spends treating a patent. So, on average, the cost of providing care was 119% of Medicare's reimbursement rates. Adding a small margin to the cost of providing services would yield an algorithmically recommended reimbursement lower than overrides insurers set.

103.     When the algorithm inevitably delivered a too-low repricing recommendation, MultiPlan Cartel members agreed, MultiPlan would set the reimbursement level as the insurer's hand-picked "override." Thus, UnitedHealth, for example, would (almost always) pay healthcare providers for 350% (later 250%) of Medicare's too-low reimbursement rates. And on the off chance Data iSight produced a claims value higher than the insurer's preferred "ceiling" override, members of the Cartel agreed that MultiPlan would "apply the [ceiling override] on a claim as the final price."

104.     Other insurers used the same rationale to set their secret overrides. Cigna, for example, set its "ceiling" at 400% of Medicare rates—meaning any OON charge for more than 400% of Medicare was shunted into the Data iSight "algorithm." It then targets an even lower allowable charge.

105.     So the "floor" set by Cartel members in consultation with MultiPlan was not just a floor—it was also a ceiling. The MultiPlan Cartel did not use the Data iSight algorithm to generate fair or reasonable reimbursement recommendations; it used it to ensure that the insurer co-

conspirators could fix the exact amount they wanted to pay doctors, and then disguise that amount as a legitimate, algorithmically derived payment.

106.    Returning to UnitedHealth as an example, this methodology allowed insurers to dramatically underpay healthcare providers. When UnitedHealth used FAIR Health's transparent and accurate UCR benchmarks, it paid providers and average of 60% to 70% of their billed charges. When UnitedHealth used MultiPlan's corrupt methodology and secret override of 350% of Medicare rates, Mr. Haben testified, its payments fell to 31-40% of billed charges. And when UnitedHealth slashed its "floor" ceiling to 250% of Medicare, its payments fell to 25% of the billed charges.

107.    For its part, MultiPlan claimed these overrides functioned as "guardrails that ensure a reimbursement never strays below or above a benchmark." In reality, the overrides provided a means of covertly fixing prices at exactly what insurers wanted to pay. In one of its secret white papers available to co-conspirators and other insurers considering joining the conspiracy, MultiPlan claimed that its methodology assured that the recommended reimbursements generated by the Data iSight algorithm would never be lower than "the amount at which 75% of hospitals in the benchmark group would be profitable." But even if that information weren't a tightly guarded secret among MultiPlan Cartel members, it would be cold comfort to healthcare providers to know that they would "only" lose money treating Cartel members' patients 25 percent of the time.

## C.    MultiPlan Allows Insurance to Identify Treatments or Providers for More Extreme Underpayment

108.    MultiPlan allows its co-conspirators to identify treatment codes that they did not want to pay for, even if the service rendered was medically necessary. Sometimes, insurers targeted specific treatments and paid even less than Medicare rates (the same rates that are 12% less than the cost of providing services). For example, a recent *The New York Times* exposé discussed the

plight of a mental health care professional that treated children with autism. She charged the same rates that the state of Virginia paid for treating Medicaid patients; but after running her bills through MultiPlan's scheme, insurer Aetna's subsidiary Meritian Health, informed the provider that it would pay less than half of Virginia Medicaid's already low rates.[3]

109.     As revealed in litigation involving Cigna, Insurers could even create "hit lists" of specific providers to target for especially deep discounts or outright denials. Cigna did this with certain substance abuse treatment centers in 2015: it targeted specific billing codes commonly used by substance abuse treatment centers, worked with MultiPlan to create a "workaround," and very quickly set itself on a "pace for a nearly 90% reduction in paid claims" in just two weeks. This use of MultiPlan's offerings was so successful, it planned to target even more substance-abuse treatment codes in the near future. Letter to Special Master, *TML Recovery, LLC v. Cigna Corp.*, No. 8:20-cv-00269-DOC-JDE  (C.D. Cal. May 18, 2023).

110.     When coupled with the secret caps on reimbursements set by the MultiPlan Cartel, these ironically named payment "integrity" services further suppressed reimbursements for out-of-network treatment.

### D.     MultiPlan's Pricing Does Not Properly Reflect Geographic Differences

111.     Although they claim to adjust for the local cost-of-living where the provider is located, they do not.

112.     Any legitimate manner of calculating OON reimbursements by commercial health insurers would take into account the geographic differences in the cost of providing medical care. The cost of living, and therefore wages, varies widely state-by-state; and within states, it varies according to whether an area is urban, suburban, or rural.

---

[3] Hamby, *supra* note 1.

113.    Although MultiPlan claims its algorithm takes these regional differences into account by applying a wage index adjustment before recommending a reimbursement, the MultiPlan Cartel does not adjust its secret payment criteria in the same manner: it offers the same payment regardless of where medical care is provided.

114.    In an example that was revealed in litigation between a bankrupt California health system and MutiPlan, that involved eight emergency room physicians' bills for moderately complex emergency room services across the country in a four-month period in 2019. The providers of those services billed one of two insurers, UnitedHealth and BlueCross & BlueShield, for those services:

a.      On January 21, an emergency physician in Wyoming charged $779;

b.      On January 25, an emergency physician in Arizona charged $1,212;

c.      That same day, an emergency physician in New Hampshire charged $1,047;

d.      On February 8, an emergency physician in Oklahoma charged $990;

e.      On February 10, an emergency physician in Kansas charged $778;

f.      That same day, an emergency physician in New Mexico charged $895;

g.      On March 25, an emergency physician in California charged $937; and

h.      On May 20, an emergency physician in Pennsylvania charged $1,094.

115.    After subjecting the providers' bills to MultiPlan's Data iSight algorithm and applying the secretly agreed upon pricing overrides, MultiPlan recommended, and UnitedHealth and Blue Cross paid, the same amount *down to the penny* for every one of those treatments: $413.39. MultiPlan and its insurer partners did not adjust this amount to account for the fact that the cost of living varied greatly among the locations where service was provided, despite their

representations to providers, plan sponsors, patients, and the public to the contrary.[4] These $413.39 payments, derived by the MultiPlan Cartel by collusive agreement, represented between 46% and 66% less than a usual, customary, and reasonable payment calculated using a fair and independent benchmark, like FAIR Health's.

**E.      MultiPlan's Repricing "recommendations" are Effectively Binding on Its Insurer Clients**

116.      Although they claim that the reimbursement value MultiPlan returns to insurers is then forwarded to the provider merely as a "recommendation," it is not. MultiPlan forbids an insurer from undercutting the aims of the MultiPlan Cartel by offering to pay anything other than the "recommendation" MultiPlan generates.

117.      Because MultiPlan and its competitors have agreed on the repricing methodology that will be used, the repricing recommendations generated by MultiPlan's repricing tools  are accepted by commercial health insurance payors and offered to healthcare providers without alteration.  In most cases, the payor authorizes MultiPlan to make the repricing offer and negotiate the OON claim on its behalf—completely abdicating all pricing authority to its competitor.

118.      MultiPlan's claims repricing customers such as UnitedHealth make clear that the prices they pay for OON claims are set by MultiPlan.  UnitedHealth sends provider remittance advice forms to healthcare providers telling them how much they will be paid for OON services. In those forms, UnitedHealth adds the code "IS" to indicate that the OON claim was priced by MultiPlan

119.      MultiPlan generates parallel OON prices even when the Fair Health and usual, reasonable, and customary UCR rates for those services differ substantially.

---

[4] "Verity Health blames bankruptcy on MultiPlan price fixing," *Modern Health* (Nov. 2, 2021), https://www.modernhealthcare.com/legal/verity-health-blames-bankruptcy-multiplan-price-fixing

120.     MultiPlan also maintains an online provider portal in which providers can review "proposed agreements" to accept "adjusted prices" offered by its Data iSight tool.  Each of the proposed agreements contains "terms of agreement" that require the provider to refrain from billing the patient for the unpaid balance of the charges.  Each of these adjusted prices reflects a substantial underpayment relative to the billed charges.

121.     Those high acceptance rates are not due to the validity of MultiPlan's repricing methodology, but rather are the result of the agreement between insurance competitors to fix prices, leaving healthcare providers no alternative but to accept the suppressed MultiPlan repricing offers. In the instances where MultiPlan offers to negotiate its repricing offers, the negotiations are one-sided.  Because MultiPlan and its competing payors have agreed not to compete with one another, the question in these negotiations is not whether the healthcare provider will be harmed by the MultiPlan Cartel, but how much.  In any event, whether "co-conspirators retain some pricing discretion" or are able to "deviate" from prices is not determinative.[5]  Thus, even if MultiPlan's repricing was the beginning of a negotiation (which it is not), it cannot immunize the MultiPlan Cartel's agreement to fix prices.

122.     Indeed, MultiPlan's 30(b)(6) witness testified during a deposition in the *LD, et al. United Behavioral Health, et al.*, 4:20-cv-02254-YGR (N.D. Cal.), case that she was unaware of a time when UnitedHealth ever rejected a claim price for a particular type of claim.

123.     Moreover, a UnitedHealth witness in the same case testified that they "leave [the] role and responsibility up to Viant and their team to support and defend how they've arrived at

---

[5] Hannah Garden-Monheit & Ken Merber, *Price fixing by algorithm is still price fixing*, FTC Business Blog (March 1, 2024), https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing.

those allowed amounts."

124.     The same witness also testified that they typically do not reject Viant's pricing. Specifically, she said:

> A. It's a recommendation -- you know, you may be referring to that as a recommendation on an individual claim, but all recommendations that you return we're using as our go-out pricing for any clients that have Viant R&C.

> Q. Okay. Doesn't United have the right to reject or use any of the Viant prices?

> A. We can. We typically do not. There may be one-off situations where that may occur for various reasons. But for the most part the volumes of claims that we send that do get priced with Viant pricing we're utilizing that pricing and payment.

125.     In the No Surprises Act context, MultiPlan itself admits that (1) a small fraction of claims go into arbitration, and (2) once there, the independent dispute resolution process is "clunky" and "inefficient." For example, during the 42nd Annual J.P. Morgan Healthcare Conference, former MultiPlan CEO Dale White said about NSA:

> The process itself is relatively efficient and smooth, except for when it gets to the IDR stage. When it gets to the IDR stage, which is the smallest percentage of claims, of our no-surprises claims, the ones that end up in arbitration is a fraction of their overall NSA claim volume. Once it gets there, it's very clunky, very inefficient, and we've had to invest in it. We had to dedicate some expenses in '22 and '23, in support of just that IDR component. We'll continue to do so. We think there's opportunity for us. It's a complex process. As I said earlier, we've invested in it.

126.     Medical practices interviewed by *The New York Times* confirmed their inability to negotiate over prices generated by MultiPlan. *The New York Times* interviewed Tammie Farkas, who handles billing for her husband's small New York-area practice focused on repairing blood vessels in the brain. She said "It's not a real negotiation" when MultiPlan transmits offers of payment on behalf of insurers. [6] *The New York Times* further reported that "[i]nsurers can set negotiation parameters for MultiPlan, including not negotiating at all, records and interviews show. Multiple providers and billing specialists said that in recent years they had increasingly been told

---

[6] Hamby, *supra* note 1.

their claims weren't eligible for negotiation."[7]

127.    MultiPlan's repricing tools are not merely the beginning of a negotiation.  On its website, MultiPlan notes that Data iSight repricing is accepted 96% of the time by providers, and 93% of the time by facilities, "making it a defensible methodology for payors." A 2018 MultiPlan study cited even higher numbers: MultiPlan claimed 99.4% of all OON claims for inpatient treatment that are repriced by Data iSight are accepted by healthcare providers.  Those acceptance figures were similar for outpatient (98.7%) and professional (94.5%) care.  In 2023, MultiPlan's new CEO, Travis Dalton, told the news outlet Axios that 98% of its repriced claims are accepted by providers.

128.    If MultiPlan negotiates on the insurer's behalf, the agreement between MultiPlan and the insurer provides that the insurer "*shall* pay the healthcare provider in accordance with  the . . . negotiated reimbursement amounts negotiated by" MultiPlan. And even when MultiPlan has not negotiated, other sections of the agreement forbid an insurer from paying less than what MultiPlan "recommends." This, functionally, guarantees the insurer will always pay exactly what MultiPlan commands it to—because if the provider has not disputed MultiPlan's recommendation, the insurer has no incentive whatsoever to pay *more* than the amount the healthcare provider has accepted. So insurers accept MultiPlan's "recommendations" and offer them to healthcare providers without alteration.

### F.    Providers Have Little Choice But to Accept MultiPlan's Fixed Prices

129.    And although MultiPlan claims to negotiate with providers dissatisfied with the reimbursement offered, they do not—or at least they do not negotiate in good faith. Regardless, the MultiPlan Cartel's price-setting mechanism functions to lower the start of negotiations with

---

[7] Hamby, *supra* Note 1.

providers.

130.     MultiPlan employees describe an internal culture and incentive structure which discourages them from negotiating reasonable rates with providers.  *The New York Times* reported that employee bonuses are tied to payment reductions.  "I knew they were not fair," it quoted former MultiPlan negotiator, Kajuana Young, as saying about the prices generated by MultiPlan.

131.     In financial documents, marketing materials, and other publications, MultiPlan touts high acceptance rates by healthcare providers as evidence that the reimbursement amounts it generates through its Data iSight scheme are considered fair and reasonable by physicians.

132.     On its website, MultiPlan says that its Data iSight reimbursement rates are accepted by providers 96% of the time and facilities 93% of the time, "making it a defensible methodology for payors." In a 2018 study, MultiPlan boasted of even higher acceptance rates, comparing acceptance rates to the "savings" insurers received. For inpatient care, MultiPlan slashed 53% off of providers' bills, and yet providers accepted the Cartel's reimbursement offers 99.4% of the time. For outpatient care, Multiplan slashed 75% off of providers' bills, and yet providers accepted this treatment 98.7% of the time. And for professional care, MultiPlan slashed 69% off of providers' bills, and enjoyed a 94.5% acceptance rate.

133.     But make no mistake: these acceptance rates do not reflect healthcare professionals' acknowledgement that the MultiPlan Cartel's reimbursement offers were fair. Rather, they reflect the cold reality that, except in some unusual circumstances, healthcare providers have no choice but to accept the suppressed rates. First, there is the sheer volume of claims that providers would have to dispute. With almost all insurers (and all the major ones) using MultiPlan, providers would have to negotiate every single bill, individually. Most healthcare providers, especially small local practices like Plaintiff's, lack the resources to undertake a claim-by-claim negotiation for every

single patient they see. Second, healthcare providers have no other option. Because more than 700 of the country's 1100 health insurers have agreed not to compete with each other, and instead to underpay healthcare providers, a provider dissatisfied with the Cartel's reimbursement offerings cannot simply stop seeing the patients of one outlier insurer with unreasonably low rates. It is almost the entire industry. If a provider were to stop seeing patients from every offending insurer, that provider would have no patients.

134.    Often, healthcare providers cannot negotiate: MultiPlan allows its Cartel members to instruct it not to negotiate *at all*, or to negotiate only within a very narrow window of potential reimbursement rates. This is what Cigna does, for example: according to a Cigna representative's sworn testimony, Cigna imposed "predetermined" "parameters" within which MultiPlan could negotiate with providers.

135.    When providers *do* negotiate with MultiPlan, they risk the very real possibility that they will fare even worse. If a provider refuses to accept the reimbursement rate generated by MultiPlan's Data iSight scheme, MultiPlan attempts to impose an even lower rate on the provider. For example, in one fax to a doctor, MultiPlan threatened that if the provider refused to accept the "proposal" "this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient." Others have reported deadlines of mere hours to accept outrageously low MultiPlan Cartel offers. Healthcare practices and their billing specialists say that MultiPlan has followed through on these threats.

136.    As one analyst has observed, when remarking on MultiPlan's negotiation strategy:

MultiPlan's key strategy for forcing doctors to accept low prices is by erecting a bureaucratic layer so thick and complicated that few can navigate it . . . . MultiPlan preys

37

on physicians using subtly forceful [communications], expecting physicians' medical billing staff to not have time to fight through layers of bureaucratic tape.[8]

137.     The short time frame for a response offered by the MultiPlan Cartel also effectively prohibits healthcare providers from obtaining more information about the artificially depressed offers for the care they provide. If a healthcare provider or their billing agent calls in with questions about an unexpectedly low reimbursement amount, MultiPlan representatives allow that individual only five questions before hanging up on them, regardless of whether the representative can even answer the questions. And if a provider persists in attempts to secure a fair payment, MultiPlan often drags the process out, and Cartel members delay payment to the provider. As one woman in charge of billing for a healthcare provider put it: "It's not a real negotiation." In its role as a "mafia enforcer for insurers," MultiPlan gives providers an "offer" they cannot refuse—accept the cut-rate reimbursement or watch it be cut even further.

138.     To further frustrate negotiation efforts, the Cartel refuses to allow providers to negotiate with insurers directly: all communications must go through MultiPlan. MultiPlan controls the entire OON claims handling process for these payors—from setting the reimbursement rate and sending it to the provider to "negotiating" any changes to the rate and satisfying the claim. And to ensure reimbursements remain low even for those providers that persevere in attempts to negotiate, MultiPlan ties its employees bonuses to the size of the reductions, which inspires MultiPlan's negotiators to force providers to accept payments they knew were not fair.

139.     The Insurer Defendants have outsourced not only pricing decisions, but also claim collection, to MultiPlan, as a consequence of their agreement to provide MultiPlan with real-time claims data. Yet at the same time, it will refuse to negotiate with a provider to reach a payment level

---

[8] Olivia Webb, "MultiPlan, the secret back-end to most of the insurer industry, is going public," *Acute Condition* (Aug. 5, 2020). https://www.acutecondition.com/p/multiplan-the-secret-back-end-to

above the secret caps imposed by members of the conspiracy, claiming that it cannot authorize greater payment because it is not the insurer. This charade occasionally, and intentionally, gives providers nobody with whom to negotiate.

140.    The widespread use of MultiPlan's repricing tools by the largest insurance providers across the United States leaves providers with no alternative but to accept the artificially suppressed rates. The sheer volume of reimbursement claims alone makes it near impossible for Plaintiffs to negotiate with MultiPlan, as providers would be required to negotiate each individual claim. Repricing the claims as part of a nationwide conspiracy with its largest competitors assures MultiPlan that the providers nowhere to turn for relief. In some cases, Defendants have instructed MultiPlan to make its claims processed with MultiPlan's repricing tools non-negotiable, forcing Plaintiffs into a bind. Thus, they successfully impose these artificially suppressed, unsustainable rates on providers 99.4% of the time. Thus, MultiPlan's anticompetitive repricing scheme has successfully replaced the traditional "reasonable and customary" model.

### G.    MultiPlan is Compensated for Repressing Reimbursement Rates

141.    MultiPlan makes money on its claims repricing services by charging its horizontal competitors a fee based on the difference between a healthcare provider's original claim and the amount the provider receives following MultiPlan's repricing of the claim.  This fee is usually equal to 5–7% of the "savings," but has been as high as 12%.  As such, MultiPlan is incentivized to recommend the lowest reimbursement price possible, since it increases the fee MultiPlan charges.  The less money that is paid to healthcare providers, the more money MultiPlan makes.

142.    As explained above, MultiPlan's analytics products make money by taking a percentage, usually 5–7%, of the difference between the billed claim and the amount that the insurer actually pays for the care provided (known internally as the "PSAV").  According to a May

10, 2023 Quarterly Report that MultiPlan filed with the SEC, 90.9% of MultiPlan's revenues were generated through this PSAV model in the first three months of 2023.

## VI.    EVIDENCE OF AN ILLEGAL AGREEMENT

143.    When the Insurer Defendants were no longer bound to use the FAIR Health database, they looked for alternative means to suppress OON payments.

144.    The Insurer Defendants were looking for something to function much as Ingenix did in the 2000s, and recognized the value in relying on a third party to develop claim repricing methodologies.  For example, a Chief Risk Officer at Cigna wrote that "[w]e cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)" and that "[Cigna] needed someone (external to Cigna) to develop acceptable rates."

145.    In 2019, UnitedHealth sought to create a "sense of urgency" to persuade companies still using the FAIR Health database to move away from it and sought to help such companies "understand they don't want to be on that program anymore."[259]  Indeed, Multiplan and Insurer Co- Conspirators' anticompetitive scheme would prove far more lucrative and far less transparent.

### A.  Direct Evidence

### 1.    Contracts

146.    Commercial insurance payors admit that they have agreements with MultiPlan to reprice OON claims.  For example, UnitedHealth states that a healthcare provider may be offered "[a] rate recommended by Viant, an independent third-party vendor that collects and maintains a database of health insurance claims for facilities, then applies proprietary logic to arrive at a

---

[9] Hamby, *supra* Note 1 (The process has been described as "not a real negotiation."  Offers are known to come with "all-caps admonitions and deadlines just hours away. Accept and receive prompt payment; refuse and risk an even lower payout. Practices and billing specialists said this often wasn't an empty threat.").

recommended rate." Similarly, Blue Cross Blue Shield of Michigan has disclosed that MultiPlan is one of its "subcontractors," and describes MultiPlan's Data iSight service as "a pricing tool that . . . calculate[s] a 'fair' reimbursement."

147.    MultiPlan has entered agreements with some 700 insurers, including the Insurer Defendants, which expressly contemplate that MultiPlan and the insurer will collude to set the reimbursement levels for OON claims. These contracts include an agreement to share proprietary data, to use MultiPlan's repricing technologies to lower payments made on claims for reimbursement by OON healthcare providers, and to allow MultiPlan to negotiate rates with providers to eliminate balance billing. Several of these contracts are publicly available.

148.    One agreement between MultiPlan and Aetna, for example, provides that the parties must mutually agree upon pricing preferences, and that Aetna will honor rates negotiated by MultiPlan so long as they are "consistent with the business criteria mutually agreed upon between [Aetna] and [MultiPlan]." The parties also agree "[w]here the negotiated amount is less than the original billed charge," MultiPlan must "obtain the provider's signed agreement to the revised amount or secure proper documentation stating no 'balance bill' to the patient except for deductible, co-insurance and non-covered services based on the providers' adjusted price[.]"

149.    The Insurer Defendants routinely admit to the existence of their agreements to suppress OON reimbursement claims in communications with healthcare providers and the public. Health care providers routinely receive communications from MultiPlan in which MultiPlan concedes that it has "contracted with" one or more healthcare payors that compete against MultiPlan's PPO networks.

150.    The Network Rental Agreement between Aetna and MultiPlan was entered into in 2011, its existence was not made public until it was filed with the Washington State Insurance

Commissioner on December 22, 2021

### 2. Communications between MultiPlan and the Insurer Defendants

151.     MultiPlan sends regular closure reports and performance reports to its Co-Conspirators showing the amount that MultiPlan's proprietary pricing methodology underpriced each OON claim and the underpayment that the provider received as a result of MultiPlan's agreement to stop competing with its competitors on claims pricing and to underpay OON claims. In the case of United, MultiPlan sent closure and performance reports to the dedicated email address UHCClosureReports@uhc.com. Later, MultiPlan sent the performance reports and closure reports to UnitedHealth using a File Transfer Protocol process.

152.     MultiPlan also provides quarterly, weekly, and daily reports to its Co-Conspirators concerning MultiPlan's ability to slash the prices of OON claims. These reports are typically broken down into Administrative Services Only ("ASO") and fully insured reports. For example, MultiPlan routinely sent reports on provider appeals from MultiPlan's OON pricing, state reports, situs reports, and specialty reports.

153.     MultiPlan's Co-Conspirators fill out preference sheets in which MultiPlan and its Co-Conspirators specifically agree on how much they will suppress each OON claim submitted at the CPT code level.

### 3. MultiPlan's Patent

154.     MultiPlan obtained a U.S. patent  (U.S. Patent No. 8,103,522, filed by NCN) that describes its repricing methodology. It explains that Defendants are explicitly agreeing on the methodology that will be used to calculate and diminish OON reimbursement payments. The patent shows MultiPlan agrees with its customers, the Insurer Defendants (i.e., competing healthcare payors) on the methodology or calculation that MultiPlan's repricing tool will use to

curb reimbursement payments to healthcare providers.

155.     The patent explains that when MultiPlan receives an OON claim, it groups that claim into a refined diagnosis related group ("rDRG")—a standardized method of grouping insurance claims used by Medicare and some commercial health insurance networks that categorizes medical services on the basis of severity and complexity.  Then, MultiPlan identifies all claims at similar hospitals for the same rDRG code. Next, MultiPlan attempts to estimate the hospital's cost of providing that rDRG-coded service based on that group of hospitals' cost report submissions to the U.S. Centers for Medicare and Medicaid and the wage index of the hospital submitting the OON claim.  Next, MultiPlan calculates the markup and margin for each submitted rDRG-coded OON claim using the following equation: ((Average Charge) - (Average Cost)/(Average Cost))*100.

156.     By securing this patent, MultiPlan erected a high barrier to competition. It already faced almost no competition from other claims repricing companies: it processed 273 times more claims than its closest competitor, Zelis. But by patenting its repricing methodology, it ensured that it could prevent anyone from launching a competing product and luring Cartel members away to restore competition in the market for OON claims reimbursements until the patent expires in October 2029.

### B.     Circumstantial Indicia of an Anticompetitive Agreement

### 1.     Parallel Conduct

157.     The members of the MultiPlan Cartel engaged in parallel conduct. They suppressed the amount paid to healthcare providers for OON claims and, in a continuous and parallel fashion, sent repricing notices and depressed payments to healthcare providers pursuant to the MultiPlan Cartel agreement.

43

158.    MultiPlan also facilitated a transition away from a marketplace in which commercial insurers competed to offer OON providers UCR reimbursements to a coordinated regime in which commercial health insurance networks cut reimbursement payments to healthcare providers and then split those "savings" with self-funded insurance plans.

159.    The insurance market is made up of two types of plans, risk-based (also called "fully insured") and ASO (also called "self-funded"). Under a risk-based model, the insurance company collects premiums and pays claims. If the premiums exceed the claims, the insurance company profits, but if the claims exceed the premiums, the insurance company carries the risk of loss. Under an ASO model, the employer carries the risk instead—the premiums are paid into the coffers of the employer, and the employer is responsible for paying its employees' claims. The employer pays the insurance company a fixed administrative services fee, per member, per month (a "PMPM" fee) to administer the ASO plan. Under these ASO contracts, the employers take on the risk and associated insurance companies enter into "shared savings agreements" that permit the insurance company to send OON claims for ASO employers to MultiPlan for repricing. Large employers, which make up a substantial or even dominant portion of the market for commercial insurance, are almost all on ASO contracts.

160.    In order to profit from the OON reimbursement suppression under the MultiPlan Cartel, the cartel members added new terms to their ASO contracts. In addition to the PMPM fees, those ASO contracts now require self-insured groups to pay a percentage (as high as 35%) on the difference between a billed OON charge and the amount paid on that out- of-network claim, known as the "shared savings fee." Under the most egregious instances of claim reimbursement suppression, that shared savings fee could end up being even higher than the amount paid to the provider performing the services.

44

161.    For example, a notification concerning Nokia Corporation's ASO plan notes that Nokia participates in a "shared savings program" administered by United. That notice states: "UnitedHealthcare uses a service called Data iSight to review select out-of-network claims and recommend a reduced payment amount for out-of-network covered services."

162.    These shared savings agreements generate tremendous profits for insurance companies and self-funding employers at the expense of medical providers. UnitedHealth made approximately $1.3 billion from its shared savings agreements to suppress OON claims in 2020. Moreover, in an internal presentation, UnitedHealth stated that it intended to cut its out-of- network reimbursements by $3 billion by 2023.

163.    Therefore, if a subscriber group self-finances its health insurance benefits and enters into an ASO agreement with a commercial health network, the subscriber group, health insurer, and MultiPlan enter into multiple explicit agreements to suppress OON reimbursement payments to healthcare providers and then split the ill-gotten profits from their conspiracy among MultiPlan, the insurance company, and the subscriber group.

164.    As a result of these agreements, UCR reimbursement, once the industry standard, has gone by the wayside. As John Haben, the former Vice President of Networks at United, testified under oath, United, like the rest of the commercial insurance industry, moved from paying OON claims at "reasonable and customary" rates, or rates determined by benchmarking databases, to using MultiPlan's OON claim suppression tools. One example of such a benchmarking database is FAIR Health, an independent database that houses aggregated information designed to provide a reasonable and consistent basis for setting reimbursement rates. Before MultiPlan's repricing scheme, FAIR Health was widely used throughout the industry in pricing OON reimbursements.

165.    Mr. Haben testified that UnitedHealth did not want to continue using "reasonable

and customary" reimbursement rates because those costs were "uncontrolled." As a result, "reasonable and customary" reimbursements for OON claims are a "legacy program" that UnitedHealth rarely, if ever, uses.

166.    Similarly, Debra Nussbaum, an employee of Optum, which is a subsidiary of UnitedHealth, testified at a deposition in the *In re: Out of Network Substance Use Disorder Claims Against UnitedHealthcare*, 19-cv-02075 (C.D. Cal.), case that "when [she] first started with Optum/United Behavioral Health, many plans were utilizing reasonable and customary or UCR. I think that, over time, I've seen a major shift to other out-of-network reimbursement methodologies."

167.    Instead, United, like all of its competitors, has shifted to a "shared savings" model where, instead of paying the prevailing "reasonable" rate for a service, they all use the same tools to reduce reimbursements.  And since they all have the same "shared savings" clauses in their ASO contracts, they all profit in the exact same way.

168.    This parallel shift to a new paradigm was orchestrated by MultiPlan, whose sales executives have repeatedly touted the ability of their repricing service to create "savings" by underpaying OON claims.  For instance, in 2014, MultiPlan told competing insurance networks that inpatient and practitioner savings for its Data iSight product were between 55% and 65%.  They told multiple competing networks about the "success" their competitors had experienced in implementing Data iSight and other MultiPlan claims repricing services—thereby encouraging those networks to join their competitors in implementing parallel conduct.

169.    MultiPlan advertises to competing health insurance networks that Data iSight achieves "optimal reimbursement"—i.e., lower payments to healthcare providers—when "compared to Usual and Customary and Medicare-Based pricing."

170.     As a result of this coordination by MultiPlan, nearly all major insurance companies have implemented "shared savings" strategies, and nearly all of them use MultiPlan's tools to implement those services.

171.     MultiPlan's repricing services also generate parallel repricing offers. According to a complaint filed against MultiPlan in *Emergency Group of Arizona Professional Corp., et al. v. United Healthcare, Inc., et al.*, Case No. CV2019-004510 (Sup. Ct. Ariz., Maricopa Cnty., June 10, 2019), MultiPlan's repricing services result in members of the MultiPlan Cartel offering parallel reimbursement amounts for OON services regardless of the location where the service is offered. For instance, charges that submitted for CPT code 99284 (emergency department visit for the evaluation and management of a patient) on different dates in early 2019, and in different states, nonetheless resulted in MultiPlan presenting the same reimbursement price:

| Location | Date of Service | Billed Amount | CPT Code | Allowed Amount |
|---|---|---|---|---|
| Wyoming | 1/21/19 | $779 | 99284 | $413.39 |
| Arizona | 1/25/19 | $1,212 | 99284 | $413.39 |
| New Hampshire | 1/25/19 | $1,047 | 99284 | $413.39 |
| Oklahoma | 2/8/19 | $990 | 99284 | $413.39 |
| Kansas | 2/10/19 | $778 | 99284 | $413.39 |
| New Mexico | 2/10/19 | $895 | 99284 | $413.39 |
| California | 3/25/19 | $937 | 99284 | $413.39 |
| Pennsylvania | 5/20/19 | $1,094 | 99284 | $413.39 |

This makes no sense absent the existence of a conspiracy. Because the cost of care in Manhattan, New York, is higher than in Manhattan, Kansas, all legitimate methods of reimbursing out-of-network claims account for the geographic difference between where care is administered.

172.     In a competitive market, competing health insurance networks would not agree to use a common tool provided by the same company to suppress OON claims. Among other things,

by paying reasonable OON reimbursement rates, health insurance networks could be certain that their insureds would not be refused treatment in contexts where a healthcare provider had the ability to refuse treatment (i.e., outside of the emergency department). Moreover, absent a conspiracy, health insurance networks would make independent decisions on how to reimburse OON claims, with the freedom to consider the specific circumstances underlying each submitted claim, rather than automatically underpaying claims through MultiPlan's across-the-board methodology.

173. Even if competing health insurance networks' only natural incentive was to keep OON claims effectively contained, they would not naturally agree to do so using the same tools from the same provider, which also happens to be a rival PPO network operator. Instead, these competitors should want to compete to find the optimal balance between keeping the costs of claims down while also minimizing the costs of claims disputes that arise when reimbursement offers are too low.

174. But if the competing health insurance networks agree to implement the exact same reimbursement suppression strategies, they can collectively maximize their profit while shielding themselves from the costs of disputes. The only market players that lose are the providers who have no choice but to accept the suppressed reimbursement offers.

### 2. Market Concentration

175. The relevant product market for Plaintiffs' claims is the market for reimbursements paid by commercial insurers to healthcare providers for OON medical services. Within the relevant market, there are submarkets for reimbursements paid by each commercial insurer (or payor) for the OON medical services provided to patients enrolled in that insurer's health insurance plan. In this market, healthcare providers like Plaintiffs function as sellers of OON

48

services and commercial insurers like MultiPlan function as buyers of those services.

176.    Healthcare providers have no reasonable substitutes for the reimbursements provided by commercial insurers for OON medical services. Under various federal and state laws, it is illegal for healthcare providers to seek reimbursements from insureds for most out- of-network claims. Defendants—who dominate the market—force healthcare providers to forego any reimbursement from insureds as a condition of receiving any compensation at all, no matter how meager, for OON claims.

177.    Government sources offer reimbursement payments to healthcare providers, but none of these sources—including Medicare, Medicaid, and Tricare—compete with commercial health insurance. These government sources service populations that are not typically served by commercial health insurance. For example, both Medicare and Medicaid have statutory age, income, and disability requirements, and Tricare is only available to current and former members of the United States military.

178.    For purposes of Plaintiffs' claims, the relevant geographic market is the United States. Medical providers in the United States cannot practicably turn to payors in other countries, where private medical insurance is either uncommon or non-existent. The United States healthcare industry, including the market for reimbursement of OON services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries.

179.    Defendants, through their conspiratorial contracts, collectively hold dominant power in the relevant market. Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to curb out-of-network reimbursement payments. The members of the MultiPlan conspiracy collectively control at least 90% of the relevant market.

180.    MultiPlan faces only limited competition in the out-of-network claims repricing

business. MultiPlan claims Data iSight differentiates itself through its patented repricing methodology and its large, proprietary database of historical claims, whereas other claims repricing services base their methodologies on UCR rates or Medicare rates.

181. MultiPlan's main competitor, Zelis, along with other claims repricing services, are small-time players compared to MultiPlan. In 2022, Zelis processed approximately 2 million claims for repricing. According to a June 28, 2023 presentation, in 2022, MultiPlan processed 546 million claims, accounting for $155 billion in claims.

182. Defendants' high market concentration is circumstantial evidence of agreements to conspire. This power has allowed the MultiPlan conspiracy to flourish and impose anticompetitive effects on the entire relevant market.

183. And healthcare providers have no choice when seeking payment for OON services they provided to a patient. Oftentimes, their only option for reimbursement is submitting a claim to the patient's particular insurance company. If that insurance company is a member of the MultiPlan conspiracy, the healthcare provider has no choice but to seek reimbursement from a MultiPlan repriced claim.

### 3. Barriers to Entry

184. Entering the American health insurance commercial reimbursement market is hindered by high barriers to entry. New entrants must be able to bear massive expenditures of time and money, required to develop a robust network of healthcare providers large enough to compete as a commercial healthcare insurer. Even without developing an insurance network, there are enormous capital outlays required to operate as a commercial healthcare payor. Entrants then face the challenge of contending with the economies of scale that large incumbent insurers possess. Obtaining name recognition in an industry occupied by longstanding and well-known major

players presents an additional hurdle.

185.     There is also an actuarial risk for new health insurance networks. If they cannot balance claims paid and revenue generated through premiums or network access fees (such as ASO fees), their capital reserves can quickly deplete.

186.     Even if a new entrant to the market experiences initial success, it may not be able to survive long enough to see a return and develop a base of business to allow it to effectively maintain its insureds. Any such new entrant would need to generate enough business fast enough to effectively spread its risk.

187.     Furthermore, a new entrant to the market would be charged with receiving accreditation in every state in which it seeks to operate—functionally all 50 states plus Washington D.C., must ensure it is in compliance with all applicable federal and state laws, and must assemble what is an expensive team of experts to remain up to speed on all of the latest developments in the various applicable laws and regulations.

188.     These barriers to entry further solidify the dominance of the members of the MultiPlan conspiracy alleged herein by ensuring that any entity which tries to enter the market but rejects MultiPlan's price-fixing scheme cannot undermine the conspiracy members' ability to impose repriced reimbursement rates on healthcare providers for OON services.

189.     In fact, the repricing services themselves also present a high barrier to entry. To develop a third-party repricing service, a new entrant would need to spend copious amounts of money to develop source code and algorithms that effectively reprice OON claims without infringing MultiPlan's patents, develop contractual relationships with the hundreds of commercial insurance networks, and commit significant resources to consistently improving its repricing algorithms and software. As a result, it is unlikely that any company could effectively disrupt

MultiPlan's repricing scheme.

190.    These numerous high barriers to entry effectively prevent new entrants from interrupting MultiPlan's position of control. Therefore, these barriers to entry provide further circumstantial support for the existence of the conspiracy alleged herein.

### 4.    Motive and Opportunity

#### a.    Motive

191.    Defendants share the same financial motivation to suppress reimbursement payments for OON services, because all members of the MultiPlan Cartel make more money the lower they can suppress OON claims reimbursements. As MultiPlan explained in an internal presentation to members of the Cartel: the Cartel's incentives are "completely aligned."

192.    MultiPlan is paid a percentage of the spread, or the underpayment to healthcare providers (ordinarily between 5-7%). MultiPlan only makes money for its "repricing" and "data integrity" services if the Cartel is successful in suppressing OON reimbursement payments. The more MultiPlan suppresses reimbursements, the more MultiPlan makes.

193.    Similarly, the Insurer Defendants are incentivized to suppress payments to healthcare providers to increase their own profits. For ASO clients, the Insurer Defendants receive a "shared savings fee" or "processing fee" representing a percentage of the spread. For fully funded plans, the insurance company collects a fee and makes money by spending less than that fee. With either type of plan, the Insurer Defendants make more money the more than claims are suppressed.

194.    Sometimes Defendants suppress payments to healthcare providers so much that the fees that MultiPlan and the Insurer Defendants charge for these "savings" exceed the amount the provider receives for providing medical care. For one example, when a medical facility providing outpatient substance abuse treatment received $134.13 on a claim, Cigna, the payor, received

$658.75—nearly five times as much as the provider—as a processing fee. And MultiPlan received $167.48—more than the provider—for its role in suppressing the claim. This perverse example is just one. Court records show that this pattern frequently repeats itself. Indeed, Cigna received $4.47 million in processing fees from employers related to addiction treatment claims in California. MultiPlan received $1.22 million for its role in repricing those claims. The providers received just $2.56 million.

195.    Defendants also have a motive to conspire with MultiPlan to avoid the legal issues like those created by their use of Ingenix. For example, in an internal email Cigna Chief Risk Officer Eva Borden explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)." Rather, Cigna "need[ed] someone (external to Cigna) to develop acceptable" reimbursement rates. MultiPlan gladly, greedily, and anticompetitively complied.

196.    MultiPlan implies that its repricing tools create a legally permissible scheme by offering to enter into formal contracts for those services, regardless of the truth that conspiracy agreements of this kind are disincentivized by American law.

### b.    Opportunity

197.    Defendants have ample opportunities to conspire, including through MultiPlan's facilitation of private communications among competing insurance networks.

198.    MultiPlan's road shows provided numerous opportunities for Defendants to conspire. For instance, in 2019, major health insurance executives, including those from the Insurer Defendants, met in Laguna Beach, California. At this gathering, MultiPlan executive Dale White professed that "MultiPlan is Magic" and discussed "a few things up [its] sleeve" that might benefit the insurers.

199.    Defendants also have opportunities to collude by way of their other industry connections. For example, many Defendants are members of industry associations such as AHIP (formerly "America's Health Insurance Plans"). Aetna, Centene, Cigna, Elevance, HCSC, Humana, and many others are members of AHIP.

200.    AHIP provides it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."

201.    Numerous of Defendants' executives hold positions on AHIP's Board of Directors, including Gail K. Boudreaux, President and CEO of Elevance; David Cordani, Chairman and CEO of Cigna; and Maurice Smith, President, CEO, and Vice Chair of HCSC.

202.    AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in closed-door meetings.

203.    A federal court in California found that entities' overlapping membership in AHIP and participation in AHIP events presented sufficient opportunities to conspire so as to demonstrate a *per se* horizontal price-fixing agreement.

204.    MultiPlan and industry groups such as AHIP both offer ample opportunities for Defendants to collude regarding the MultiPlan conspiracy.

**5.    Prior Collusion**

205.    It is easier for firms in a market to conspire with one another if they have done so before. The industry participants know one another and know that they can trust each other to conspire and not alert the government to the existence of the cartel.

206.    That is the case here, as many, if not all, of the Defendants previously conspired to fix prices through the Ingenix scheme, discussed in Section IV(E), *supra*.

**6.    Actions Against Self-Interest**

207. A rational actor in a competitive market would not act against its own economic self-interest. Yet members of the MultiPlan Cartel have taken many actions against members' self-interest.

208. First, the agreements between MultiPlan and insurers are, themselves, against the members' self-interest. If a single insurance provider chose to enter into an agreement with MultiPlan, shift away from the traditional UCR method of calculating OON reimbursements, and drastically underpay for OON claims, healthcare providers would *en masse* refuse to treat patients subscribing to that provider when possible (i.e., except in emergency situations). The healthcare provider would then experience serious diminishment in the value and breadth of their insurance offerings and a loss of subscribers, and, therefore, business. It would also make it less likely healthcare providers would join their network, further reducing the value of the insurer's PPO plan and diminishing its earnings.

209. The single contracting insurance provider would also likely have to undergo lengthy and expensive repricing negotiations after facing pushback from providers. Because numerous insurers have entered into a conspiracy to reprice claims, it is less effective (and less possible) for healthcare providers to negotiate due to the sheer volume of repriced offers.

210. The number of negotiations that occur now with members of the MultiPlan Cartel are limited, because the ubiquity of the under-reimbursements from almost every insurer in the market makes it impossible for a healthcare provider to dispute every underpayment. But if a single insurer engaged in MultiPlan's repricing scheme, healthcare providers could more easily negotiate the offending offers.

211. Members of the Cartel have also refrained from taking actions in their own self-interest. For example, none of the co-conspirators has in-sourced their OON repricing efforts, even

though, by doing so, they could increase their profits by retaining the fees they otherwise pay to MultiPlan. The one insurer to have attempted this, UnitedHealth, abandoned its efforts after spending considerable sums developing an in-house competitor to MultiPlan's repricing scheme, and instead reaffirmed its commitment to the Cartel.

212.    And members of the Cartel have acknowledged that they could not accomplish their dramatic "savings"—i.e., underpayments to providers—without MultiPlan's involvement. They learned this lesson from the Ingenix saga. As Cigna's Chief Risk Officer—the executive responsible for trying to limit the insurer's legal risk—wrote to colleagues:

> We cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)    We need someone (external to Cigna) to develop acceptable [rates].[10]

In other words, the ability to call MultiPlan independent, and to point to MultiPlan as the repricer, rather than an internal subsidiary, was critical to insurers hiding the scheme and avoiding legal risk.

### 7.    Monitoring and Enforcement Within the MultiPlan Cartel

213.    The MultiPlan Cartel has structures for monitoring and enforcing the cartel.

214.    Typically, a cartel agreement is more stable if the participants in the cartel have a reliable means of ensuring that each of the members of the cartel is abiding by the collusively set price by monitoring and enforcing their pricing agreement.  One of the most efficient ways for members of a cartel to reach an agreement on collusive pricing and to ensure that pricing sticks is for every member of the cartel to allow one competitor to set prices and negotiate those prices. That is exactly what has happened here.  Each of the competing payors, who should have been exercising their own discretion to set prices for OON claims, entered into agreements that gave MultiPlan the right to set prices for each cartel member's OON claims and then made MultiPlan

---

[10] Hamby, *supra* Note 1.

the sole entity responsible for negotiating payment of those collusively set prices.

215.     MultiPlan and its Co-Conspirators were brazen enough to write formal contracts that included dispute resolution provisions.  For example, MultiPlan's contract with Aetna contains a clause enforcing their OON pricing agreement through "mediation . . . administered by the American Arbitration Association under its Mediation Rules for Commercial Financial Disputes . . . in the city of New York."  The contract contemplates the possibility that if that mediation was unsuccessful, MultiPlan could sue Aetna to, among other things, enforce the terms of their OON pricing agreement.  This threat of litigation or mediation served as a check that ensured the compliance of MultiPlan's Co-Conspirators.

216.     MultiPlan's PSAV payment model also enables MultiPlan's Co-Conspirators to ensure that MultiPlan is underpaying OON claims.  MultiPlan sends regular reports to competing payors about how little a healthcare provider is paid for OON claims as a result of MultiPlan's proprietary pricing methodology.  From these reports, MultiPlan's competitors can monitor how well MultiPlan is adhering to its agreement to cause healthcare providers to be underpaid for OON claims.

217.     In addition, MultiPlan recently increased its ability to exchange real-time pricing data and benchmarking information.  In June 2023, it announced a new product in its Data and Decision Science solution suite: PlanOptix.

218.     MultiPlan said it created PlanOptix as a direct response to its payor-competitors' demands.  The product enables "access" to 400 billion "fully indexed" records.  For example, a payor can "search a CPT code and understand the price of that particular service . . . at a provider under a certain network."  However, payors told MultiPlan that "[i]t's not enough to simply get to the data and information because the records are vast."  They wanted direct competitor pricing

information.

219. When MultiPlan first announced PlanOptix, it had already "ingested data on over 70 payers," including "all of the national major carriers as well as many of the regional ones."

220. Per payors' requests, MultiPlan enhanced PlanOptix to show competitor pricing data—"not just at a global level, but even at a service level right, labs and X-rays versus inpatient, inpatient versus outpatient." MultiPlan explained that, using PlanOptix, payors would be able to answer questions such as: "Where do I sit versus my competitor?" and "How do I ensure that I'm negotiating correctly when I measure myself against my competitors?"

221. In other words, PlanOptix enables the members of the MultiPlan Cartel to monitor one another's adherence to their agreement to suppress OON reimbursements by eliminating price competition on OON claims. It does so by allowing health insurance payors to directly compare how much they pay to a particular provider for a particular type of out- of-network service.

222. At the November 28, 2023 Bank of America Leveraged Finance Conference, Mr. White openly stated that the purpose of PlanOptix is to "enable payers to benchmark themselves against their competitors." He explained that, using PlanOptix, a payor will know "whether they're above or below or on par with their competition," including with regard to reimbursements paid to "a specific provider."

223. Because a cartel agreement is against public policy, members need to create informal structures of detecting attempts to disrupt the cartel agreement and ways of enforcing the cartel agreement by heading-off those attempted disruptions. One enforcement mechanism is to offer deals to members to dissuade them from leaving the cartel.

224. UnitedHealth's plan to abandon the MultiPlan Cartel and to use its in-house Naviguard system to reprice OON claims was one such attempted disruption to the cartel agreement.

Having the largest healthcare payor in the United States defect from the MultiPlan Cartel would inevitably destabilize the agreement and might cause other payors to reevaluate their participation in the cartel.

225.    So, MultiPlan bought off UnitedHealth with a sweetheart deal.  Upon information and belief, in 2022, MultiPlan and UnitedHealth negotiated a new contract for repricing services that went into effect in 2023.  MultiPlan gave UnitedHealth extremely favorable commercial terms, allowing UnitedHealth to capture nearly all of the underpayments generated by MultiPlan's claims suppression methodology.

226.    This sweetheart deal was so good for UnitedHealth that it caused a temporary drop in MultiPlan's financial performance, which MultiPlan executives discussed during quarterly earnings calls with investors in the fourth quarter of 2022 and the first quarter of 2023.  In MultiPlan's 2022 fourth quarter earnings call, MultiPlan's then-CEO Dale White explained, "we have been anticipating that a multiyear contract renewal with one of our largest customers would mute our 2023 revenue growth" and that the contract renewal would be "a headwind against growth in 2023."

227.    As a result of MultiPlan's efforts to keep its largest customers using its repricing tools and in the cartel, in the first quarter of 2023, MultiPlan experienced a 20.6% drop in revenues versus the first quarter of 2022 and a 30.7% drop in earnings before interest, taxes, depreciation, and amortization versus the first quarter of 2022.

228.    However, MultiPlan was willing to sacrifice short-term revenues and profits in order to stabilize the cartel and keep the largest cartel members in the fold.  As MultiPlan's then-CEO Dale White explained during MultiPlan's earning call for the first quarter of 2023, renewing repricing agreements with the largest healthcare payors in the United States made MultiPlan's

leadership "increasingly confident that our revenues are stabilizing and poised for growth over the next several years."

229.    In an apparent effort to sweeten the deal and keep UnitedHealth in the cartel, on June 27, 2023, MultiPlan announced that John Prince, the former President and Chief Operating Officer of Optum, UnitedHealth's health services subsidiary, would join MultiPlan's board of directors.

230.    MultiPlan's efforts to enforce the cartel agreement by buying the loyalty of one of the largest payors in the cartel appears to have worked. In an August 2, 2023 press release, the CEO of MultiPlan hailed the second quarter of 2023 as an "inflection point" in which MultiPlan "deliver[ed] second quarter results at the high end of our expectations," leading MultiPlan to increase its revenue guidance for investors for 2023.

231.    MultiPlan's willingness to sacrifice short-term profits does not make economic sense absent its knowledge that perpetuating its conspiracy to underpay healthcare providers would pay off in the long run.

### 8.    Exchange of Sensitive Information

232.    Defendants and similar commercial insurance competitors are unlikely to exchange large volumes of competitively sensitive information in the absence of an agreement ensuring the others would do the same.

233.    But here, MultiPlan, the Insurer Defendants, and other competing health insurance companies have agreed to exchange data regarding health care providers' claims, reimbursement offers made in response to those claims, and the actual amount paid on those claims.

234.    Defendants are exchanging real-time pricing data by way of transmitting it automatically to MultiPlan through electronic links. This data is specific to commercial insurance

claims. And the data—pricing information updated <u>in real time</u>—is not publicly available. MultiPlan endorses that its analytics-based services are driven by "[p]roprietary and public data sources." Finally, the shared data is granular and unblinded, meaning MultiPlan knows <u>exactly</u> what its competitors are charging for medical services.

235.     MultiPlan is using this proprietary, real-time pricing data to explicitly share confidential pricing information between members of the conspiracy to fix prices. For example, when seeking to establish UnitedHealth's out-of-network reimbursement rates, MultiPlan told UnitedHealth that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor."

236.     Competing companies would not ordinarily risk sharing their real-time, competitively sensitive pricing information with their rivals. More, they would not simultaneously pay those rivals—in this case MultiPlan—millions of dollars absent an agreement to restrain competition. Defendants' information exchange is more consistent with an agreement to restrain trade than with competition on the merits. Therefore, this type of information exchange is circumstantial evidence of a cartel agreement among competitors.

### 9.     Patterns of Dealing and Ongoing Relationships

237.     MultiPlan has a long history of forming, maintaining, and stabilizing the conspiracy. MultiPlan boasts that it is "deeply embedded into [its co-conspirators'] claims platforms." MultiPlan emphasizes the long-term nature of its relationships with its claims repricing clients. In a June 28, 2023, investor presentation, it stated that its "Average Length of Large Customer Relationships" was over 25 years.

238.     For over a decade, the leading commercial health insurance providers in the United States Commercial Reimbursement Market have been bound to multi-year contracts to use

MultiPlan's claims repricing tools. MultiPlan's consistent public statements trumpeting this high level of market participation and promoting upwards of 90% acceptance rates of its reimbursement offers provide encouragement and reassurance to other members of the conspiracy.

239.    MultiPlan has effectively taken the lead in recruiting new members to its conspiracy, espousing the advantages of collusive pricing to them, warning they will suffer a drastic financial disadvantage if they do not participate in the cartel, and enforcing price discipline by encouraging members to match their competitors' repricing standards.

240.    These customary patterns, formulas, leadership, and other courses of dealing are circumstantial evidence of agreements and a conspiracy to suppress reimbursement rates.

## VII.    THE PARAMETERS OF DEFENDANTS' ANTICOMPETITIVE SCHEME
### A.  Structure

#### 1.    The MultiPlan Cartel is a Horizontal Agreement Among Competitors

241.    For the reasons stated in Section IV(D), *supra*, MultiPlan and the Insurer Defendants are competitors. For the reasons stated in Section VI, *supra*, there is ample direct and circumstantial evidence that MultiPlan and the Insurer Defendants have entered into a horizontal price fixing agreement that is per se illegal.

#### 2.    Alternatively, the MultiPlan Cartel Is a "Hub-and-Spoke" Cartel Agreement

242.    Even if the MultiPlan Cartel were not a horizontal price-fixing agreement between competitors, it would be a "hub-and-spoke" agreement that is likewise *per se* illegal under the Sherman Act. MultiPlan is the "hub" of the conspiracy and the Co- Conspirator insurance companies' agreements with MultiPlan to reprice their claims are the "spokes." The "rim" of the conspiracy is the agreement between the Co-Conspirator insurance companies to use MultiPlan's repricing methodologies to suppress OON reimbursement payments.

243.    Prior to the Co-Conspirators joining the MultiPlan Cartel, commercial health

insurance providers made several attempts to underpay healthcare providers through unilateral action. For example, before it joined the MultiPlan Cartel in 2017, in May 2015, UnitedHealth paid $11.5 million to resolve claims that it used down-coding software algorithms, stalling tactics, and other unfair business practices to underpay healthcare providers in Connecticut, New York, North Carolina, and Tennessee. Likewise, in September 2015, UnitedHealth agreed to pay $9.5 million to settle claims that it systematically underpaid OON claims in California. However, these unilateral efforts could be thwarted by healthcare providers, because the providers could elect to provide non-emergency care to patients from other health insurance networks.

244. Commercial health insurance companies realized the need for collective action. Initially, UnitedHealth attempted to solve that collective action problem using its subsidiary, Ingenix. However, when the New York State Attorney General shut down the Ingenix scheme, commercial health insurers needed a new way to agree among themselves to underpay OON claims.

245. MultiPlan solved that problem. It advertised itself to insurance companies as a hub that could be used to collectively reduce OON payments to healthcare providers. As MultiPlan told its investors, using MultiPlan is a "much better mechanism" for payors to collectively slash reimbursements "versus doing it themselves." According to MultiPlan, this is because "if a pay[o]r decides to do everything on their own, their ability to go back to providers and push for savings is fundamentally different than ours. [W]e can talk to the entire industry." For example, as noted above, MultiPlan told UnitedHealth that many of United's competitors were using MultiPlan's repricing services to slash OON reimbursement rates. MultiPlan further advised UnitedHealth on the pricing levels and methodologies adopted by its competitors: it told UnitedHealth that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack

along with another competitor." MultiPlan eventually reached an agreement to reprice United's claims which put United, in its own words, in the "middle of the pack of its peers." Thus, one spoke of the conspiracy was formed—the agreement between MultiPlan and UnitedHealth to suppress OON reimbursements in reference to their competitors' pricing levels and methodologies.

246.     MultiPlan persuaded the vast majority of large competing health insurance companies to become "spokes" in the conspiracy through similar inducements. MultiPlan has contracts with the "top 15" health insurance payors in the nation and agreements with over 700 insurance payors to reprice their claims. Each of these contracts between a health insurance payor and MultiPlan forms another "spoke" in the MultiPlan Cartel's "hub-and-spoke" conspiracy.

247.     MultiPlan uses similar tactics to facilitate collusion along the rim of the alleged hub-and-spoke conspiracy. MultiPlan informs each of the payors that other major payors are using MultiPlan's repricing services to suppress OON claims, that those payors are generating substantial revenues by underpaying OON claims, and that the payor can bring itself into "alignment" with the rest of the industry and be in the "middle of the pack" on OON claims suppression by working with MultiPlan.

248.     Thus, each of the payors knows that its competitors have considered or are considering the same terms offered by MultiPlan—i.e., suppressing OON claims payments and splitting the revenues generated by doing so. Each payor has a strong motive to enter into the conspiracy because they know that without substantially unanimous action, agreeing to unilaterally cut OON reimbursement payments would be economically self-defeating. And, in the end, each payor agrees to the same course of conduct (suppressing OON claims via an agreement with MultiPlan), which constitutes an important departure from their prior practice of using UCR or FAIR Health benchmarks to compete against one another on out-of- network reimbursement

payments.

249.     Importantly, there is no valid business reason for each of MultiPlan's Co-Conspirators to have entered into agreements with MultiPlan to cut reimbursements paid to out-of-network healthcare providers. Larger payors could have created their own in-house repricing tools (and some came close to doing so). Smaller payors could have used the FAIR Health benchmark to reprice claims. The only plausible explanation for every healthcare payor of any consequence agreeing to use MultiPlan's OON claims suppression methodology is that MultiPlan provided them with assurances that they could agree to do so with the common understanding that they would not be undermining one another via competition on reimbursement rates.

250.     As discussed above, there is extensive circumstantial evidence that health insurance companies have agreed with each other to use MultiPlan's "repricing" methodology to suppress OON reimbursement payments to healthcare providers, thus forming the "rim" of the conspiracy. This includes evidence that MultiPlan facilitated a parallel transition among insurance companies from a competitive regime to a coordinated regime, and a variety of "plus factors" that tend to exclude the possibility that this parallel conduct was the result of independent action.

## B. Market Definition

251.     The geographic market is the United States. The relevant geographic market is not smaller than the United States because healthcare providers can practicably and do turn to commercial insurers located in other parts of the country for reimbursement of OON services. Healthcare providers can choose to file claims on behalf of their OON patient and are not bound by the patient's contract with his or her health insurer. The United States' healthcare industry, including the market for reimbursement of OON services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries and is subject to a variety of

unique federal and state laws and regulations that apply only in the United States. Medical providers in the United States cannot reasonably turn to payors in other countries – where private medical insurance is uncommon or non-existent and nearly all medical care is administered as part of a comprehensive government program – to be reimbursed for OON medical services.\

252.    The relevant product market is the market for the reimbursement of OON provider services by third-party payers. In this market, healthcare providers like Plaintiff are sellers of out-of- network medical care, while third-party payers like the Insurer Defendants are buyers of those services. Healthcare providers in this market have no reasonable substitutes for the reimbursements provided by commercial insurers for OON medical services, as balance billing patients is futile or illegal in many if not most instances.

253.    MultiPlan and the Insurer Defendants through their conspiratorial agreements, collectively hold dominant power in the relevant market. Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to suppress OON reimbursement payments. The members of the MultiPlan Cartel, including MultiPlan, UnitedHealth, Cigna, Humana, Elevance, Aetna, Guidewell, collectively control at least 90% of the relevant market.

### C.    Effects of Defendants' Scheme

### 1.    The MultiPlan Cartel Has Affected Interstate Commerce

254.    Defendants' conduct as described herein has engaged in and substantially affected interstate commerce. Healthcare providers that Defendants reimburse for OON health services, such as Plaintiffs, provide services, goods, and facilities to people who reside in many states. Defendants also operate PPOs throughout the United States. Defendants' conspiracy comes within the flow of and intentionally, directly, substantially, and reasonably foreseeably affects interstate commerce in the United States.

2.      **The MultiPlan Cartel Has Had Anticompetitive Effects**

255.    The MultiPlan Cartel restrains competition in the relevant market.

256.    The MultiPlan Cartel has been tremendously successful, bilking healthcare providers out of billions of dollars even during a once-in-a-century pandemic.  Since acquiring Data iSight in 2011, MultiPlan's analytics business has grown considerably.  Revenues generated by Data iSight jumped from $25 million in 2011 to $323.7 million in 2019.  By 2020, analytics-based service such as Data iSight made up more than 59% of MultiPlan's annual revenues.  In 2021, MultiPlan's analytics-based services generated $709 million of its $1.1 billion in total revenues.  MultiPlan explained in 2023 that its analytics business typically earns profit margins "in the mid to high 60% range."

257.    MultiPlan has been similarly open about the effect its anticompetitive price-fixing has on providers.  In its investor presentations, MultiPlan openly touts the fact that it helps its competitors systematically underpay healthcare providers.  During a fall 2021 investor roadshow presentation, MultiPlan explained to investors that in an illustrative world "Without MultiPlan," a doctor could expect to make $800 on an OON claim, but in an illustrative world with MultiPlan, a doctor would only make $600 on the same OON claim—a 28.6% difference.

258.    In another presentation, MultiPlan claimed that its repricing tool was even more effective, writing that it provided insurers "savings of 61%–81% off billed charges."

259.    MultiPlan benefits from the MultiPlan Cartel in the same ways its horizontal competitors do.  By agreeing to suspend competition with respect to the reimbursement of out-of-network claims, MultiPlan is able to artificially underpay those claims, inflating the profits of its PPO insurance business.

260.    According to an enforcement action by the NYAG against AXA Equitable, in May 2009, AXA had a policy of reimbursing 100% of OON claims.  Without prior notice to its

subscribers, in September 2011 AXA switched to using MultiPlan's Data iSight system to reprice OON claims. As a result of that switch, AXA went from paying 100% of OON claims to paying about 50% of those OON claims.

### 3. Plaintiff and Other Providers Have Suffered Antitrust Injuries

261.    The MultiPlan Cartel directly damages Plaintiff's business and property, and that of other members of the Class. Plaintiff has sustained and continues to sustain economic losses—the full amount of which Plaintiff will calculate after discovery and prove at trial—due to Defendants' artificial suppression of reimbursement rates for OON healthcare services.

262.    But for Defendants' conspiracy to fix the price paid for OON healthcare services, Plaintiff and members of the proposed Class would have received higher reimbursement rates for OON healthcare services.

263.    While the conspiracy continues, Plaintiff and proposed Class members will continue to suffer losses.

264.    The antitrust laws aim to prevent injuries such as those alleged here that stem from a conspiracy among buyers to systematically suppress the price paid for a good or service, such as OON healthcare services. Agreements to reduce price competition or fix prices violate the antitrust laws.

265.    The outsourcing of both insurers' rate-setting decisions and claims negotiation responsibilities, as well as Defendants' anticompetitive information exchange, has corrupted the market for OON provider services, replacing independent centers of decision-making with a single effective decisionmaker, MultiPlan, and disrupting the competitive process. Insurers' collective use of MultiPlan's repricing services to set artificially low reimbursement rates subverts the competitive process by depriving the market of "independent centers of decisionmaking" and

replacing them with decision-making on prices by one shared pricing "brain."

266.    Economic theory and antitrust jurisprudence show that such joint delegation schemes, particularly when accompanied by information exchange, reduce the intensity of price competition and artificially suppresses compensation below competitive levels.  In recent guidance to human resources professionals, the Department of Justice Antitrust Division ("DOJ") stated that "[s]haring information with competitors about terms and conditions of employment" can be anticompetitive in that it decreases competition below competitive levels by allowing firms to match each other's compensation rather than compete for services by offering additional compensation.

267.    That is precisely what has happened with respect to the prices insurers pay for OON care consumed by their subscribers.  As a result of the MultiPlan Cartel, reimbursement rates provided to healthcare providers, including Plaintiff, for OON claims have been suppressed below competitive levels.

268.    According to an April 2020 study published by the Office of the New York State Comptroller, depending on the service provided, OON reimbursements paid based upon MultiPlan's repricing methodology were 1.5 to 49 times lower than UCR-based reimbursements for the same services.  And whereas prior to 2016, reimbursement rates typically rose over time, since 2016 they have fallen year-over- year.

269.    The suppression of OON reimbursement rates caused by the MultiPlan Cartel also indirectly suppresses in-network rates by undermining the ability of providers to leave insurance networks if in-network rates fall too low, a key form of leverage providers would have in the negotiation of those in-network rates in the absence of the MultiPlan Cartel.  Because of the Cartel, even if providers attempt to leave insurance networks and bill subscribers on an OON basis based

on the prevailing market rate, MultiPlan ensures that they will receive reimbursement amounts that are roughly equal to in-network rates and which are unreasonably low. By undermining the economic viability of providers performing services on an out-of- network basis, insurers strip providers of a key form of leverage—the ability to decline network participation if in-network rates are too low—thereby suppressing in-network reimbursement rates.

270.     By reason of the unlawful activities alleged herein, Defendants substantially affected interstate trade and commerce throughout the United States, and caused antitrust injury to Plaintiff and members of the proposed Class.

**4.     Defendants' Conduct Has No Procompetitive Effects or Justifications**

271.     Defendants' collective pricing scheme has harmed competition while producing no procompetitive effects.

272.     While Defendants' misconduct has increased their revenues and profits, it has harmed competition, healthcare providers, and consumers. Defendants have systematically paid sub- competitive reimbursements for OON healthcare services, which reduces the revenue available to healthcare providers to improve and expand access to healthcare. The conspiracy has also already limited consumers' healthcare options due to hospital closures forced by the conspiracy. The conspiracy does not, however, contain healthcare costs. Defendants burden healthcare providers and consumers to benefit themselves alone, all while unfairly labeling healthcare reimbursement claims as "egregious" to justify their misconduct.

273.     Even though Defendants' misconduct has increased their operational efficiencies and profit margins by outsourcing reimbursement pricing to a single, automated decision maker that processes and relies on all their non-public claim data to set prices, it has added inefficiencies and artificially reduced payments to healthcare service providers who provide the important out-

of- network care upon which our healthcare system relies. Simply put, the conspiracy provides no procompetitive benefits.

274. And even assuming any de minimis procompetitive benefits from Defendants' misconduct exists (and they do not), they could not outweigh the significant and ongoing anticompetitive effects that the conspiracy has caused in the market.

## VIII. EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

275. From at least July 1, 2017 through the present, MultiPlan and members of the MultiPlan Cartel have affirmatively and fraudulently concealed the existence of the MultiPlan Cartel from Plaintiff and other providers by various means and methods.

276. By equitable estoppel, Defendants' concealment of their unlawful conspiracy has tolled any applicable statute of limitations for Plaintiff and the Class with respect to any claims and rights of action that Plaintiff and the Class have alleged in this Complaint.

## A. Plaintiff Was Not On Inquiry Notice of an Antitrust Claim, Nor Could Have Plaintiff Discovered the Basis for the Claims Asserted Herein, Outside of the Limitations Period

277. The agreements among the Defendants (both express and implied), including their agreement to tamp down reimbursement payments to providers, were not available to Plaintiff. Plaintiff is not a party to those agreements. Due to non-disclosure and confidentiality clauses in the contracts, Plaintiff could not have reasonably accessed the underlying terms that would have alerted Plaintiff of a potential antitrust claim.

278. The nature of how MultiPlan's tools suppress reimbursement payments for out-of-network claims is non-public and proprietary. MultiPlan creates white papers that describe in detail the relevant pricing processes that those tools use for OON claims. Some, but not all, of those white papers have been made public in court filings, but all within the limitations period

279. Defendants engaged in a secret and inherently self-concealing conspiracy that did

not reveal facts sufficient to put Plaintiff or the proposed Class on inquiry notice.

280.    Defendants other than MultiPlan privately submitted their own non-public claims data to MultiPlan, and MultiPlan in turn used its proprietary repricing tools, the details of which remain confidential, to propose reimbursement rates. The inner workings and true nature of this process are secrets that are not shared with providers like Plaintiff and the proposed Class.

281.    Defendants regularly attended invitation-only industry events, including events held and sponsored by MultiPlan, where they discussed behind closed doors how MultiPlan's repricing tools allowed them to reduce costs by suppressing OON reimbursement rates.

282.    Defendants had private communications and meetings to discuss out-of- network claim repricing, MultiPlan's repricing tools, and use of those tools, including by each Defendant's competitors. Plaintiff and the proposed Class therefore had neither actual nor constructive knowledge of the facts giving rise to their claim for relief. Plaintiff and the proposed Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of Defendants' conspiracy until shortly before filing this complaint.

283.    Through Defendants' knowing and active concealment of their misconduct, Plaintiff and the proposed Class did not receive information that should have put them, or any reasonable person or provider standing in their shoes, on sufficient notice of collusion worthy of further investigation.

284.    Plaintiff and the Class were not placed on actual or constructive notice of the conspiracy alleged herein until, at the very earliest, March 7, 2022 well within the limitations period, when an article on *The Capitol* Forum website first raised concerns about MultiPlan's

antitrust compliance,[11] but not likely until the *New York Times* published an expose about MultiPlan's practices, based largely on recently unsealed documents in other litigation, on April 7, 2024.

285. While there have been civil cases filed by providers and others relating to MultiPlan's repricing practices, some filed within the limitations period, others slightly outside the limitations period, the only one filed prior to 2023 that raised antitrust claims (*VHS Liquidating Trust, et al. v. Blue Cross Blue Shield Association, et al.*, Case Number RG21106600 (Cal. Super. Ct. Alameda Cnty.)) was filed in state court (not effectively putting Plaintiff on notice), and, in any event, was filed in November 2021, well within the limitations period.

### B. Actions Taken to Mislead and Conceal

286. Throughout the Class Period, the Defendants effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiff and the Class, and the conspiracy was inherently self-concealing.

### 1. Representations that MultiPlan is Not an Insurer

287. MultiPlan affirmatively misrepresents that it is not in the insurance business. Its website states: "We are not an insurance company" and "*MultiPlan is not a health insurance company* and does not sell insurance directly or indirectly through agents or brokers" (emphasis in original). This is incorrect. MultiPlan is very much in the insurance business.

### 2. Representations about How MultiPlan's Repricing Scheme Works

288. MultiPlan's explanation of its pricing methodology to providers was false and misleading. MultiPlan and the other Defendants intentionally hid from the proposed Class,

---

[11] "Multiplan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say," *The Capitol Forum* (Mar. 7, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/.

including Plaintiff, that reimbursement prices were actually determined by use of a shared pricing system that used Defendants' real-time, non- public claims data and combined it with their competitors' real-time, non-public claims data to set OON reimbursement rates.

289. MultiPlan also made false and misleading statements to conceal that it colluded with and orchestrated insurers (*i.e.*, its competitors) to work in concert to artificially suppress payments to healthcare providers.

290. MultiPlan and the other Defendants also spent years claiming that reimbursements were derived by algorithm, when in fact they were fixed by the cartel's members.

**3. Representations that Defendants Comply With Applicable Laws and Regulations**

291. Plaintiff relied on Defendants' promises to obey the law and act with integrity.

292. MultiPlan's published Code of Business Conduct and Ethics states that it is "committed to conducting our business with integrity at all times," and that "only legal and ethical means should be used to gather information about existing and potential competitors."

293. Similarly, Aetna's Code of Conduct provides that employees must "obey all laws and regulations that apply to Aetna's business," "be honest and act with integrity in all of your Aetna business dealings," "must not be part of any conduct . . . that is intended to mislead, manipulate, or take unfair advantage of anyone, or misrepresent Aetna products, services, contract terms or policies to a . . . provider," and "[d]o not agree with representatives of a competing company, or with others, to be part of these or any other practices that may illegally restrain competition: fixing prices…"

294. Cigna's Code of Ethics and Principles of Conduct contain similar misleading information. Cigna says it will "comply with applicable laws" and "will behave ethically." It claims to only "look[] for competitive advantages through legal and ethical business practices,"

that it "neither accept[s] nor tolerate[s] taking advantage of anyone through, for example, manipulating or misrepresenting information," that it "competes fairly around the world," that it "seek[s] to maintain and grow our business through superior products and services – and not through any improper or anticompetitive business practices" and so "compl[ies] with competition and antitrust laws throughout the world."

295.     UnitedHealth's Code of Conduct also instructs employees to "[a]void discussions with competitors that may appear to restrain competition unreasonably," including "[c]ommunications or agreements with competitors regarding        provider reimbursement rates . . . ." The Code specifically cautions against sharing information about provider reimbursement rates by competitors. Specifically, it addresses a hypothetical of an Optum Health employee (subsidiary of UnitedHealth): "Q. I work in Optum Health and received a request from a colleague on my old team at UnitedHealthcare for some information related to reimbursement rates of other payers. May I provide the data since we are part of the same company? A. Not without consulting your business Legal Representative or Compliance Officer. Optum Health's provider businesses contract with competitors of UnitedHealthcare and may receive competitively-sensitive information, which must be protected, and sharing the data requested without review and approval by legal counsel could be a form of unfair competition."

296.     These promises to obey the law and behave with integrity prevented Plaintiff from discovering Defendants' conduct earlier.

**C.     Defendants' Anticompetitive Conduct, and Conspiracy, are Ongoing**

297.     Defendants' wrongful conduct is ongoing, continuing at least July 1, 2017, through the present. Renewing and strengthening the agreements that underly the conspiracy and locking in its benefits has inflicted new and accumulating injury on Plaintiff and the Class.

298.     These continuing violations have tolled and suspended the running of the statute of limitations concerning the claims and rights of action of Plaintiff arising from the conspiracy, including all parts of the class period earlier in time than the four years immediately preceding the date this action was filed.

## IX.     CLASS ALLEGATIONS

299.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of members of the following Class: All health care providers in the United States who received reimbursement for OON medical treatment from no later than July 1, 2017, to the present. Excluded from the Class are (a) Defendants and their subsidiaries and affiliated entities and (b) all federal or state government entities or agencies.

300.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Further, members of the Class are readily identifiable from information and records in Defendants' possession.

301.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of the Defendants. Plaintiff and all members of the Class allege that Defendants' same misconduct violated Section 1 of the Sherman Antitrust Act. Plaintiff and all members of the Class received artificially suppressed reimbursements for OON healthcare services as a result of Defendants' same anticompetitive conduct.

302.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.

303.     Plaintiff is represented by counsel with experience in the prosecution and

leadership of class action antitrust and other complex litigation.

304.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

305.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making an award of damages to all members of the Class appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

i.    Whether Defendants formed a purely horizontal agreement, combination, conspiracy, or common understanding in which they artificially suppressed the rate paid on OON healthcare service reimbursement claims throughout the United States;

j.    Whether, in the alternative, Defendants formed a hub-and-spoke agreement, combination, conspiracy, or common understanding in which they artificially suppressed the rate paid on OON healthcare service reimbursement claims throughout the United States;

k.    Whether Defendants' alleged misconduct constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act;

l.    Whether Defendants' alleged misconduct, in the alternative, violates Section 1 of the Sherman Antitrust Act pursuant to a quick look or full Rule of Reason analysis;

m.    Whether Defendants' alleged misconduct in fact caused Class members throughout the United States to receive artificially suppressed reimbursements on OON healthcare service reimbursement claims;

n.    Whether the unlawful scheme alleged herein has substantially affected interstate commerce;

o.    Whether Defendants' anticompetitive conduct caused antitrust impact to Plaintiff and members of the Class;

p.    The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged conduct going forward;

q.    Whether Defendants fraudulently concealed the existence of the alleged conspiracy or committed continuing antitrust violations beyond the initial conspiratorial

agreement, thereby tolling the statute of limitations

    r.      The proper measure of Class-wide damages; and

    s.      Aggregate damages suffered by Plaintiff and members of the Class.

306.    The benefits of proceeding through the class mechanism, including providing injured Class members a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in management of this class action.

307.    Plaintiff reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

### X.    CAUSE OF ACTION
#### Count I
#### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

308.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in paragraphs 1 through 321 of this Complaint.

309.    Beginning on or before July 1, 2017, the Defendants formed and maintained an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, (15 U.S.C. §§ 1, 3).

310.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tool to set reimbursement rates for OON healthcare services. This conspiracy has caused Plaintiff and members of the Class to receive artificially suppressed reimbursements for OON healthcare services during the Class Period.

311.    The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors, Insurer Defendants, and a potential competitor,

MultiPlan, in the commercial health insurance market in the United States. Alternatively, the contract, combination, or conspiracy to unreasonably restrain trade and commerce alleged herein has taken the form of a hub-and-spoke conspiracy in which MultiPlan served as the hub, the agreements between MultiPlan and the Insurer Defendants and co-conspirators to use MultiPlan's claim repricing tools served as spokes, and the agreement between the spokes to use MultiPlan's repricing tools to reprice reimbursement rates for OON healthcare services claims serve as the rim. This conduct, which began no later than July 1, 2017, violates Section 1 of the Sherman Antitrust Act. In the further alternative, Defendants' conduct is an unreasonable restraint on trade with no procompetitive justification that fails under a rule of reason analysis.

312.    In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts alleged above as well as:

    a.  Insurer Defendants provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's OON claim repricing tools;

    b.  MultiPlan sold and operated its OON claim repricing tool that repriced the reimbursement rate for OON healthcare services claims;

    c.  Defendants knowingly used the same OON claim repricing tool that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for OON healthcare services claims;

    d.  Insurer Defendants paid reimbursements for OON healthcare services claims at the rates recommended by MultiPlan's repricing tool;

    e.  Insurer Defendants outsourced OON claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of OON healthcare claims at the rates recommended by its repricing tool;

    f.  Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan OON claims repricing tool; and

    g.  Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for OON healthcare services claims, including their use of MultiPlan's OON

claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

313. Defendants possess market power in the relevant antitrust market, as alleged herein: the relevant product market is reimbursements of OON healthcare services claims by commercial payors, and the relevant geographic market is the United States.

314. Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for OON healthcare services claims that fall below the traditional and competitive rates for such claims.

315. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, Plaintiff has been injured in its business and property and will continue to be injured in its business and property by receiving reimbursements for OON healthcare services claims that are lower than what they would have received absent Defendants' conspiracy.

316. Defendants' conspiracy is a per se violation of Section 1 of the Sherman Antitrust Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick look or full Rule of Reason analysis.

317. There are no procompetitive justifications for Defendants' conspiracy, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as to each count, including:

318. The unlawful conduct, conspiracy or combination alleged herein be adjudged and

decreed:

      a.   an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

      b.  a *per se* violation of Section 1 of the Sherman Act.

319.    Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable law, and that a joint and several judgments in favor of plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled;

320.    Plaintiff and members of the Damages Class recover restitution and/or disgorgement of profits unlawfully obtained;

321.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a pro rata basis;

322.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

323.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner

continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

324.  Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint; and

325.  Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: June 21, 2024

/s/ *Gary Burger*
Gary Burger (N.D. Ill. Bar No.6212156)
**BURGER LAW**
332 S Michigan Ave, Suite 900
Chicago, IL 60604
Tel: (312) 500-4878
gary@burgerlaw.com

Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
Two CityPlace Drive, Second Floor
St. Louis, MO 63141
Tel: (314) 226-1015
mflannery@cuneolaw.com

Charles J. LaDuca (*pro hac vice forthcoming*)
Evelyn Riley *(pro hac vice forthcoming)*
Claire Esmonde *(pro hac vice forthcoming)*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3930
Fax: (202) 789-1813
charles@cuneolaw.com
evelyn@cuneolaw.com
cesmonde@cuneolaw.com

John W. ("Don") Barrett *(pro hac vice forthcoming)*
Sterling Aldridge *(pro hac vice forthcoming)*
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Tel: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
saldridge@barrettlawgroup.com

*Counsel for Plaintiff and the Proposed Class*